UNITED STATES *v.* CLASSIC ET AL.

No. 618.   Argued April 7, 1941.—Decided May 26, 1941.

*Mr. Herbert Wechsler*, with whom *Solicitor General Biddle*, *Assistant Attorney General Berge*, and *Messrs. Warner W. Gardner*, *Alfred B. Teton*, *Rene A. Viosca*, and *Robert Weinstein* were on the brief, for the United States.

302

304

*Mr. Warren O. Coleman,* with whom *Mr. Charles W. Kehl* was on the brief, for appellees.

306

Mr. Justice Stone delivered the opinion of the Court.

Two counts of an indictment found in a federal district court charged that appellees, Commissioners of Elections, conducting a primary election under Louisiana law, to nominate a candidate of the Democratic Party for representative in Congress, willfully altered and falsely counted and certified the ballots of voters cast in the primary election. The questions for decision are whether the right of qualified voters to vote in the Louisiana primary and to have their ballots counted is a right "secured by the Constitution" within the meaning of §§ 19 and 20 of the Criminal Code, and whether the acts of appellees charged in the indictment violate those sections.

On September 25, 1940, appellees were indicted in the District Court for Eastern Louisiana for violations of §§ 19 and 20 of the Criminal Code, 18 U. S. C. §§ 51, 52. The first count of the indictment alleged that a primary election was held on September 10, 1940, for the purpose of nominating a candidate of the Democratic Party for

the office of Representative in Congress for the Second Congressional District of Louisiana, to be chosen at an election to be held on November 10th; that in that dis-: trict nomination as a candidate of the Democratic Party is and always has been equivalent to an election; that appellees were Commissioners of Election, selected in accordance with the Louisiana law to conduct the primary in the Second Precinct of the Tenth Ward of New Orleans, in which there were five hundred and thirty-seven citizens and qualified voters.

The charge, based on these allegations, was that the appellees conspired with each other, and with others unknown, to injure and oppress citizens in the free exercise and enjoyment of rights and privileges secured to them by the Constitution and Laws of the United States, namely, (1) the right of qualified voters who cast their ballots in the primary election to have their ballots counted as cast for the candidate of their choice, and (2) the right of the candidates to run for the office of Congressman and to have the votes in favor of their nomination counted as cast. The overt acts alleged were that the appellees altered eighty-three ballots cast for one candidate and fourteen cast for another, marking and counting them as votes for a third candidate, and that they falsely certified the number of votes cast for the respective candidates to the chairman of the Second Congressional District Committee.

The second count, repeating the allegations of fact already detailed, charged that the appellees, as Commissioners of Election, willfully and under color of law subjected registered voters at the primary who were inhabitants of Louisiana to the deprivation of rights, privileges and immunities secured and protected by the Constitution and Laws of the United States, namely their right to cast their votes for the candidates of their choice and to have their votes counted as cast. It further charged

that this deprivation was effected by the willful failure and refusal of defendants to count the votes as cast, by their alteration of the ballots, and by their false certification of the number of votes cast for the respective candidates in the manner already indicated.

The District Court sustained a demurrer to counts 1 and 2 on the ground that §§ 19 and 20 of the Criminal Code, under which the indictment was drawn, do not apply to the state of facts disclosed by the indictment, and that, if applied to those facts, §§ 19 and 20 are without constitutional sanction, citing *United States* v. *Gradwell*, 243 U. S. 476, 488, 489; *Newberry* v. *United States*, 256 U. S. 232. The case comes here on direct appeal from the District Court under the provisions of the Criminal Appeals Act, Judicial Code, § 238, 18 U. S. C. § 682; 28 U. S. C. § 345, which authorize an appeal by the United States from a decision or judgment sustaining a demurrer to an indictment where the decision or judgment is "based upon the invalidity or construction of the statute upon which the indictment is founded."

Upon such an appeal our review is confined to the questions of statutory construction and validity decided by the District Court. *United States* v. *Patten*, 226 U. S. 525; *United States* v. *Birdsall*, 233 U. S. 223, 230; *United States* v. *Borden Co.*, 308 U. S. 188, 192–193. Hence, we do not pass upon various arguments advanced by appellees as to the sufficiency and construction of the indictment.

Section 19 of the Criminal Code condemns as a criminal offense any conspiracy to injure a citizen in the exercise "of any right or privilege secured to him by the Constitution or laws of the United States." Section 20 makes it a penal offense for anyone who, acting "under color of any law," "willfully subjects, or causes to be subjected, any inhabitant of any State . . . to the deprivation of any rights, privileges, and immunities secured and

protected by the Constitution and laws of the United States." The Government argues that the right of a qualified voter in a Louisiana congressional primary election to have his vote counted as cast is a right secured by Article I, §§ 2 and 4 of the Constitution, and that a conspiracy to deprive the citizen of that right is a violation of § 19, and also that the willful action of appellees as state officials, in falsely counting the ballots at the primary election and in falsely certifying the count, deprived qualified voters of that right and of the equal protection of the laws guaranteed by the Fourteenth Amendment, all in violation of § 20 of the Criminal Code.

Article I, § 2 of the Constitution, commands that " The House of Representatives shall be composed of members chosen every second Year by the People of the several States and the Electors in each State shall have the qualifications requisite for electors of the most numerous Branch of the State Legislature." By § 4 of the same article "The times, places and manner of holding elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Such right as is secured by the Constitution to qualified voters to choose members of the House of Representatives is thus to be exercised in conformity to the requirements of state law subject to the restrictions prescribed by § 2 and to the authority conferred on Congress by § 4, to regulate the times, places and manner of holding elections for representatives.

We look then to the statutes of Louisiana here involved to ascertain the nature of the right which under the constitutional mandate they define and confer on the voter, and the effect upon its exercise of the acts with which appellees are charged, all with the view to determining,

first, whether the right or privilege is one secured by the Constitution of the United States, second, whether the effect under the state statute of appellees' alleged acts is such that they operate to injure or oppress citizens in the exercise of that right within the meaning of § 19 and to deprive inhabitants of the state of that right within the meaning of § 20, and finally, whether §§ 19 and 20 respectively are in other respects applicable to the alleged acts of appellees.

Pursuant to the authority given by § 2 of Article I of the Constitution, and subject to the legislative power of Congress under § 4 of Article I, and other pertinent provisions of the Constitution, the states are given, and in fact exercise, a wide discretion in the formulation of a system for the choice by the people of representatives in Congress. In common with many other states, Louisiana has exercised that discretion by setting up machinery for the effective choice of party candidates for representative in Congress by primary elections, and by its laws it eliminates or seriously restricts the candidacy at the general election of all those who are defeated at the primary. All political parties, which are defined as those that have cast at least 5 per cent of the total vote at specified preceding elections, are required to nominate their candidates for representative by direct primary elections. Louisiana Act No. 46, Regular Session, 1940, §§ 1 and 3.

The primary is conducted by the state at public expense. Act No. 46, *supra,* § 35. The primary, as is the general election, is subject to numerous statutory regulations as to the time, place and manner of conducting the election, including provisions to insure that the ballots cast at the primary are correctly counted, and the results of the count correctly recorded and certified to the Secretary of State, whose duty it is to place the names of the successful candidates of each party on the official

ballot.[1]  The Secretary of State is prohibited from plac-
ing on the official ballot the name of any person as a can-
didate for any political party not nominated in accord-
ance with the provisions of the Act.   Act 46, § 1.

One whose name does not appear on the primary ballot,
if otherwise eligible to become a candidate at the general
election, may do so in either of two ways: by filing nom-
ination papers with the requisite number of signatures
or by having his name "written in" on the ballot on the
final election.   Louisiana Act No. 224, Regular Session
1940, §§ 50, 73.   Section 87 of Act No. 46 provides "No
one who participates in the primary election of any
political party shall have the right to participate in a
primary election of any other political party, with the
view of nominating opposing candidates, nor shall he
be permitted to sign any nomination for any opposing
candidate or candidates; nor shall he be permitted to
be himself a candidate in opposition to anyone nominated
at or through a primary election in which he took part."

Section 15 of Article VIII of the Constitution of Louisi-
ana as amended by Act 80 of 1934, provides that "no
person whose name is not authorized to be printed on the
official ballot, as the nominee of a political party or as

---

[1] The ballots are printed at public expense, § 35 of Act No. 46,
Regular Session, 1940, are furnished by the Secretary of State, § 36
in a form prescribed by statute, § 37.  Close supervision of the de-
livery of the ballots to the election commissioners is prescribed, §§
43–46.  The polling places are required to be equipped to secure
secrecy, §§ 48–50; §§ 54–57.  The selection of election commissioners
is prescribed, § 61 and their duties detailed.  The commissioners must
swear to conduct the election impartially, § 64 and are subject to
punishment for deliberately falsifying the returns or destroying the
lists and ballots, §§ 98, 99.  They must identify by certificate the
ballot boxes used, § 67, keep a triplicate list of voters, § 68, publicly
canvass the return, § 74 and certify the same to the Secretary of
State, § 75.

an independent candidate, shall be considered a candidate" unless he shall file in the appropriate office at least ten days before the general election a statement containing the correct name under which he is to be voted for, and containing the further statement that he is willing and consents to be voted for for that office. The article also provides that "no commissioners of election shall count a ballot as cast for any person whose name is not printed on the ballot or who does not become a candidate in the foregoing manner." Applying these provisions, the Louisiana Court of Appeals for the Parish of Orleans has held, in *Serpas* v. *Trebucq,* decided April 7, 1941, 1 So. 2d 346, rehearing denied with opinion April 21, 1941, 1 So. 2d 705, that an unsuccessful candidate at the primary may not offer himself as a candidate at a general election, and that votes for him may not lawfully be written into the ballot or counted at such an election.

The right to vote for a representative in Congress at the general election is, as a matter of law, thus restricted to the successful party candidate at the primary, to those not candidates at the primary who file nomination papers, and those whose names may be lawfully written into the ballot by the electors. Even if, as appellees argue, contrary to the decision in *Serpas* v. *Trebucq, supra,* voters may lawfully write into their ballots, cast at the general election, the name of a candidate rejected at the primary and have their ballots counted, the practical operation of the primary law in otherwise excluding from the ballot on the general election the names of candidates rejected at the primary is such as to impose serious restrictions upon the choice of candidates by the voters save by voting at the primary election. In fact, as alleged in the indictment, the practical operation of the primary in Louisiana is, and has been since the primary election was established in 1900, to secure the election of the Democratic primary

nominee for the Second Congressional District of Louisiana.[2]

Interference with the right to vote in the Congressional primary in the Second Congressional District for the choice of Democratic candidate for Congress is thus, as a matter of law and in fact, an interference with the effective choice of the voters at the only stage of the election procedure when their choice is of significance, since it is at the only stage when such interference could have any practical effect on the ultimate result, the choice of the Congressman to represent the district. The primary in Louisiana is an integral part of the procedure for the popular choice of Congressman. The right of qualified voters to vote at the Congressional primary in Louisiana and to have their ballots counted is thus the right to participate in that choice.

We come then to the question whether that right is one secured by the Constitution. Section 2 of Article I commands that Congressmen shall be chosen by the people of the several states by electors, the qualifications of which it prescribes. The right of the people to choose, whatever its appropriate constitutional limitations, where in other respects it is defined, and the mode of its exercise is prescribed by state action in conformity to the Constitution, is a right established and guaranteed by the Constitution and hence is one secured by it to those citizens and inhabitants of the state entitled to exercise the right. *Ex parte Yarbrough*, 110 U. S. 651; *United States* v. *Mosley*, 238 U. S. 383. And see *Hague* v. *C. I. O.*, 307 U. S. 496, 508, 513, 526, 527, 529, giving the same interpretation to the like phrase "rights" "secured by the

---

[2] For a discussion of the practical effect of the primary in controlling or restricting election of candidates at general elections, see, Hasbrouck, Party Government in the House of Representatives (1927) 172, 176, 177; Merriam and Overacker, Primary Elections (1928) 267–269; Stoney, Suffrage in the South; 29 Survey Graphic, 163, 164.

Constitution" appearing in § 1 of the Civil Rights Act of 1871, 17 Stat. 13. While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, see *Minor* v. *Happersett*, 21 Wall. 162, 170; *United States* v. *Reese*, 92 U. S. 214, 217–218; *McPherson* v. *Blacker*, 146 U. S. 1, 38–39; *Breedlove* v. *Suttles*, 302 U. S. 277, 283, this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general power under Article I, § 8, clause 18 of the Constitution "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." See *Ex parte Siebold*, 100 U. S. 371; *Ex parte Yarbrough, supra,* 663, 664; *Swafford* v. *Templeton*, 185 U. S. 487; *Wiley* v. *Sinkler*, 179 U. S. 58, 64.

Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections. This Court has consistently held that this is a right secured by the Constitution. *Ex parte Yarbrough, supra; Wiley* v. *Sinkler, supra; Swafford* v. *Templeton, supra; United States* v. *Mosley, supra;* see *Ex parte Siebold, supra; In re Coy,* 127 U. S. 731; *Logan* v. *United States,* 144 U. S. 263. And since the constitutional command is without restriction or limitation, the right, unlike those guaranteed by the Fourteenth and Fifteenth Amendments, is secured against the action of individuals as well as of states. *Ex parte Yarbrough, supra; Logan* v. *United States, supra.*

But we are now concerned with the question whether the right to choose at a primary election, a candidate for election as representative, is embraced in the right to choose representatives secured by Article I, § 2. We may

assume that the framers of the Constitution in adopting that section, did not have specifically in mind the selection and elimination of candidates for Congress by the direct primary any more than they contemplated the application of the commerce clause to interstate telephone, telegraph and wireless communication, which are concededly within it. But in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government. Cf. *Davidson* v. *New Orleans*, 96 U. S. 97; *Brown* v. *Walker*, 161 U. S. 591, 595; *Robertson* v. *Baldwin*, 165 U. S. 275, 281, 282. If we remember that "it is a Constitution we are expounding," we cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose.

That the free choice by the people of representatives in Congress, subject only to the restrictions to be found in §§ 2 and 4 of Article I and elsewhere in the Constitution, was one of the great purposes of our constitutional scheme of government cannot be doubted. We cannot regard it as any the less the constitutional purpose, or its words as any the less guarantying the integrity of that choice, when a state, exercising its privilege in the absence of Congressional action, changes the mode of choice from a single step, a general election, to two, of which the first is the choice at a primary of those candidates

from whom, as a second step, the representative in Congress is to be chosen at the election.

Nor can we say that that choice which the Constitution protects is restricted to the second step because § 4 of Article I, as a means of securing a free choice of representatives by the people, has authorized Congress to regulate the manner of elections, without making any mention of primary elections. For we think that the authority of Congress, given by § 4, includes the authority to regulate primary elections when, as in this case, they are a step in the exercise by the people of their choice of representatives in Congress. The point whether the power conferred by § 4 includes in any circumstances the power to regulate primary elections was reserved in *United States* v. *Gradwell, supra,* 487. In *Newberry* v. *United States, supra,* four Justices of this Court were of opinion that the term "elections" in § 4 of Article I did not embrace a primary election, since that procedure was unknown to the framers. A fifth Justice, who with them pronounced the judgment of the Court, was of opinion that a primary, held under a law enacted before the adoption of the Seventeenth Amendment, for the nomination of candidates for Senator, was not an election within the meaning of § 4 of Article I of the Constitution, presumably because the choice of the primary imposed no legal restrictions on the election of Senators by the state legislatures to which their election had been committed by Article I, § 3. The remaining four Justices were of the opinion that a primary election for the choice of candidates for Senator or Representative were elections subject to regulation by Congress within the meaning of § 4 of Article I. The question then has not been prejudged by any decision of this Court.

To decide it we turn to the words of the Constitution read in their historical setting as revealing the purpose of its framers, and search for admissible meanings of its

words which, in the circumstances of their application, will effectuate those purposes. As we have said, a dominant purpose of § 2, so far as the selection of representatives in Congress is concerned, was to secure to the people the right to choose representatives by the designated electors, that is to say, by some form of election. Cf. the Seventeenth Amendment as to popular "election" of Senators. From time immemorial an election to public office has been in point of substance no more and no less than the expression by qualified electors of their choice of candidates.

Long before the adoption of the Constitution the form and mode of that expression had changed from time to time. There is no historical warrant for supposing that the framers were under the illusion that the method of effecting the choice of the electors would never change or that, if it did, the change was for that reason to be permitted to defeat the right of the people to choose representatives for Congress which the Constitution had guaranteed. The right to participate in the choice of representatives for Congress includes, as we have said, the right to cast a ballot and to have it counted at the general election, whether for the successful candidate or not. Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary is likewise included in the right protected by Article I, § 2. And this right of participation is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative. Here, even apart from the circumstance that the Louisiana primary is made by law an

integral part of the procedure of choice, the right to choose a representative is in fact controlled by the primary because, as is alleged in the indictment, the choice of candidates at the Democratic primary determines the choice of the elected representative. Moreover, we cannot close our eyes to the fact, already mentioned, that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election, even though there is no effective legal prohibition upon the rejection at the election of the choice made at the primary, and may thus operate to deprive the voter of his constitutional right of choice. This was noted and extensively commented upon by the concurring Justices in *Newberry* v. *United States, supra,* 263–269, 285, 287.

Unless the constitutional protection of the integrity of "elections" extends to primary elections, Congress is left powerless to effect the constitutional purpose, and the popular choice of representatives is stripped of its constitutional protection save only as Congress, by taking over the control of state elections, may exclude from them the influence of the state primaries.[3] Such an expedient would end that state autonomy with respect to elections which the Constitution contemplated that Congress should be free to leave undisturbed, subject only to such minimum regulation as it should find necessary to insure the freedom

---

[3] Congress has recognized the effect of primaries on the free exercise of the right to choose the representatives, for it has inquired into frauds at primaries as well as at the general elections in judging the "Elections Returns and Qualifications of its Own Members," Art. I, § 5. See Grace *v.* Whaley, H. Rept. No. 158, 63d Cong., 2d Sess.; Peddy *v.* Mayfield, S. Rept. No. 973, 68th Cong., 2d Sess.; Wilson *v.* Vare, S. Rept. No. 1858, 70th Cong., 2d Sess., S. Rept. No. 47, 71st Cong., 2d Sess., and S. Res. 111, 71st Cong., 2d Sess.

See also Investigation of Campaign Expenditures in the 1940 Campaign, S. Rept. No. 47, 77th Cong., 1st Sess., p. 48 *et seq.*

and integrity of the choice. Words, especially those of a constitution, are not to be read with such stultifying narrowness. The words of §§ 2 and 4 of Article I, read in the sense which is plainly permissible and in the light of the constitutional purpose, require us to hold that a primary election which involves a necessary step in the choice of candidates for election as representatives in Congress, and which in the circumstances of this case controls that choice, is an election within the meaning of the constitutional provision and is subject to congressional regulation as to the manner of holding it.

Not only does § 4 of Article I authorize Congress to regulate the manner of holding elections, but by Article I, § 8, Clause 18, Congress is given authority "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the Government of the United States or in any department or officer thereof." This provision leaves to the Congress the choice of means by which its constitutional powers are to be carried into execution. "Let the end be legitimate; let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421. That principle has been consistently adhered to and liberally applied, and extends to the congressional power by appropriate legislation to safeguard the right of choice by the people of representatives in Congress, secured by § 2 of Article I. *Ex parte Yarbrough, supra,* 657, 658; cf. *Second Employers Liability Cases,* 223 U. S. 1, 49; *Houston & Texas Ry. Co.* v. *United States,* 234 U. S. 342, 350, 355; *Wilson* v. *New,* 243 U. S. 332, 346, 347; *First National Bank* v. *Union Trust Co.,* 244 U. S. 416, 419; *Selective Draft Law Cases,* 245 U. S. 366, 381; *United States* v. *Ferger,* 250 U. S. 199, 205; *Hamilton* v.

*Kentucky Distilleries Co.,* 251 U. S. 146, 155, 163; *Jacob Ruppert* v. *Caffey,* 251 U. S. 264; *Smith* v. *Kansas City Title & Trust Co.,* 255 U. S. 180; *United States* v. *Darby,* 312 U. S. 100, and cases cited.

There remains the question whether §§ 19 and 20 are an exercise of the congressional authority applicable to the acts with which appellees are charged in the indictment. Section 19 makes it a crime to conspire to "injure" or "oppress" any citizen "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution." [4] In *Ex parte Yarbrough, supra,* and in *United States* v. *Mosley, supra,* as we have seen, it was held that the right to vote in a congressional election is a right secured by the Constitution, and that a conspiracy to prevent the citizen from voting, or to prevent the official count of his ballot when cast, is a conspiracy to injure and oppress the citizen in the free exercise of a right secured by the Constitution within the meaning of § 19. In reaching this conclusion the Court found no uncertainty or ambiguity in the statutory language, obviously devised to protect the citizen "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution," and concerned itself with the question whether the right to participate in choosing a representa-

---

[4] Section 19 of the Criminal Code (U. S. C., Title 18, § 51):

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than $5,000 and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States." (R. S. § 5508; Mar. 4, 1909, c. 321, § 19, 35 Stat. 1092.)

tive is so secured.[5]  Such is our function here.  Conspiracy to prevent the official count of a citizen's ballot, held in *United States* v. *Mosley, supra,* to be a violation of § 19 in the case of a congressional election, is equally a conspiracy to injure and oppress the citizen when the ballots are cast in a primary election prerequisite to the choice of party candidates for a congressional election.  In both cases the right infringed is one secured by the Constitution.  The injury suffered by the citizen in the exercise of the right is an injury which the statute describes and to which it applies in the one case as in the other.

The suggestion that § 19, concededly applicable to conspiracies to deprive electors of their votes at congressional elections, is not sufficiently specific to be deemed applicable to primary elections, will hardly bear examination.  Section 19 speaks neither of elections nor of primaries.  In unambiguous language it protects "any right or privilege secured by the Constitution," a phrase which, as we have seen, extends to the right of the voter to have his vote counted in both the general election and in the primary election, where the latter is a part of the election machinery, as well as to numerous other constitutional rights which are wholly unrelated to the choice of a representative in Congress.  *United States* v. *Waddell,* 112 U. S. 76; *Logan* v. *United States,* 144 U. S. 263; *In re Quarles,* 158 U. S. 532; *Motes* v. *United States,* 178 U. S. 458; *Guinn* v. *United States,* 238 U. S. 347.

In the face of the broad language of the statute, we are pointed to no principle of statutory construction

---

[5] In *United States* v. *Mosley,* 238 U. S. 383, 386, the Court thought that "Manifestly the words are broad enough to cover the case," it canvassed at length the objections that § 19 was never intended to apply to crimes against the franchise, and the other contention, which it also rejected, that § 19 had been repealed or so restricted as not to apply to offenses of that class.  It is unnecessary to repeat that discussion here.

and to no significant legislative history which could be thought to sanction our saying that the statute applies any the less to primaries than to elections, where in one as in the other it is the same constitutional right which is infringed. It does not avail to attempt to distinguish the protection afforded by § 1 of the Civil Rights Act of 1871,[6] to the right to participate in primary as well as general elections secured to all citizens by the Constitution, see *Guinn* v. *United States,* 238 U. S. 347; *Nixon* v. *Herndon,* 273 U. S. 536; *Nixon* v. *Condon,* 286 U. S. 73; *Lane* v. *Wilson,* 307 U. S. 268, on the ground that in those cases the injured citizens were Negroes whose rights were clearly protected by the Fourteenth Amendment. At least since *Ex parte Yarbrough, supra,* and no member of the Court seems ever to have questioned it, the right to participate in the choice of representatives in Congress has been recognized as a right protected by Art. I, §§ 2 and 4 of the Constitution.[7] Differences of opinion have arisen as to the effect of the primary in particular cases on the choice of representatives. But we are troubled by no such doubt here. Hence, the right to participate through the primary in the choice of representatives in Congress—a right clearly secured by the Constitution—is within the words and

---

[6] Section 1 now reads, 8 U. S. C. § 43: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[7] See e. g. *Guinn* v. *United States,* 238 U. S. 347; *United States* v. *O'Toole,* 236 F. 993, aff'd *United States* v. *Gradwell,* 243 U. S. 476; *Aczel* v. *United States,* 232 F. 652; *Felix* v. *United States,* 186 F. 685; *Karem* v. *United States,* 121 F. 250; *Walker* v. *United States,* 93 F. 2d 383; *Luteran* v. *United States,* 93 F. 2d 395.

purpose of § 19 in the same manner and to the same extent as the right to vote at the general election. *United States* v. *Mosley, supra.* It is no extension of the criminal statute, as it was not of the civil statute in *Nixon* v. *Herndon, supra,* to find a violation of it in a new method of interference with the right which its words protect. For it is the constitutional right, regardless of the method of interference, which is the subject of the statute and which in precise terms it protects from injury and oppression.

It is hardly the performance of the judicial function to construe a statute, which in terms protects a right secured by the Constitution, here the right to choose a representative in Congress, as applying to an election whose only function is to ratify a choice already made at the primary, but as having no application to the primary which is the only effective means of choice. To withdraw from the scope of the statute an effective interference with the constitutional right of choice, because other wholly different situations not now before us may not be found to involve such an interference, cf. *United States* v. *Bathgate,* 246 U. S. 220; *United States* v. *Gradwell,* 243 U. S. 476, is to say that acts plainly within the statute should be deemed to be without it because other hypothetical cases may later be found not to infringe the constitutional right with which alone the statute is concerned.

If a right secured by the Constitution may be infringed by the corrupt failure to include the vote at a primary in the official count, it is not significant that the primary, like the voting machine, was unknown when § 19 was adopted.[8] Abuse of either may infringe the right and

---

[8] No conclusion is to be drawn from the failure of the Hatch Act, 53 Stat. 1147, 18 U. S. C. § 61, to enlarge § 19 by provisions specifically applicable to primaries. Its failure to deal with the subject seems to be attributable to constitutional doubts, stimulated by

therefore violate § 19. See *United States* v. *Pleva,* 66 F. 2d 529, 530; cf. *Browder* v. *United States,* 312 U. S. 335. Nor does the fact that in circumstances not here present there may be difficulty, in determining whether the primary so affects the right of the choice as to bring it within the constitutional protection, afford any ground for doubting the construction and application of the statute once the constitutional question is resolved. That difficulty is inherent, in the judicial administration of every federal criminal statute, for none, whatever its terms, can be applied beyond the reach of the congressional power which the Constitution confers. *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20; *Hoke* v. *United States,* 227 U. S. 308; *Nash* v. *United States,* 229 U. S. 373; *United States* v. *Freeman,* 239 U. S. 117; *United States* v. *Darby,* 312 U. S. 100.

The right of the voters at the primary to have their votes counted is, as we have stated, a right or privilege secured by the Constitution, and to this § 20 also gives protection.[9] The alleged acts of appellees were committed in the course of their performance of duties under the Louisiana statute requiring them to count the

_____

*Newberry* v. *United States,* 256 U. S. 232, which are here resolved. See 84 Cong. Rec., 76th Cong., 1st Sess., p. 4191; cf. Investigation of Campaign Expenditures in the 1940 Campaign, S. Rept. No. 47, 77th Cong., 1st Sess., p. 48.

[9] Section 20 of the Criminal Code (U. S. C., Title 18 § 52):

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both." (R. S. § 5510; Mar. 4, 1909, c. 321, § 20, 35 Stat. 1092.)

ballots, to record the result of the count, and to certify the result of the election. Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law. *Ex parte Virginia,* 100 U. S. 339, 346; *Home Telephone & Telegraph Co.* v. *Los Angeles,* 227 U. S. 278, 287, *et seq.; Hague* v. *C. I. O.,* 307 U. S. 496, 507, 519; cf. 101 F. 2d 774, 790. Here the acts of appellees infringed the constitutional right and deprived the voters of the benefit of it within the meaning of § 20, unless by its terms its application is restricted to deprivations "on account of such inhabitant being an alien or by reason of his color, or race."

The last clause of § 20 protects inhabitants of a state from being subjected to different punishments, pains or penalties, by reason of alienage, color or race, than are prescribed for the punishment of citizens. That the qualification with respect to alienage, color and race, refers only to differences in punishment and not to deprivations of any rights or privileges secured by the Constitution, is evidenced by the structure of the section and the necessities of the practical application of its provisions. The qualification as to alienage, color and race, is a parenthetical phrase in the clause penalizing different punishments "than are prescribed for citizens," and in the common use of language could refer only to the subject-matter of the clause and not to that of the earlier one relating to the deprivation of rights to which it makes no reference in terms.

Moreover, the prohibited differences of punishment on account of alienage, color or race, are those referable to prescribed punishments which are to be compared with those prescribed for citizens. A standard is thus set up applicable to differences in prescribed punishments on account of alienage, color or race, which it would be diffi-

cult, if not impossible, to apply to the willful depriva-
tions of constitutional rights or privileges, in order to de-
termine whether they are on account of alienage, color
or race. We think that § 20 authorizes the punishment
of two different offenses. The one is willfully subjecting
any inhabitant to the deprivation of rights secured by
the Constitution; the other is willfully subjecting any
inhabitant to different punishments on account of his
alienage, color or race, than are prescribed for the pun-
ishment of citizens. The meager legislative history of
the section supports this conclusion.[10]

---

[10] The precursor of § 20 was § 2 of the Civil Rights Act of April
9, 1866, 14 Stat. 27, which reads:

"That any person who, under color of any law, statute, ordinance,
regulation, or custom, shall subject, or cause to be subjected, any in-
habitant of any State or Territory to the deprivation of any right
secured or protected by this act, or to different punishment, pains,
or penalties on account of such person having at any time been held
in a condition of slavery or involuntary servitude, except as a pun-
ishment for crime whereof the party shall have been duly convicted,
or by reason of his color or race, than is prescribed for the punish-
ment of white persons, shall be deemed guilty of a misdemeanor, and,
on conviction shall be punished by fine. . . ."

This section, so far as now material, was in substance the same as
§ 20 except that the qualifying reference to differences in punish-
ment made no mention of alienage, the reference being to "different
punishment . . . on account of such person having at any time been
held in a condition of slavery or involuntary servitude."

Senator Trumbull, the putative author of S. 61, 39th Cong., 1st
Sess., the Civil Rights Bill of 1866, and Chairman of the Senate
Judiciary Committee which reported the bill, in explaining it stated
that the bill was "to protect all persons in the United States in their
civil rights, and furnish the means of their vindication. . . ." Cong.
Globe, 39th Cong., 1st Sess., p. 211. He also declared, "The bill ap-
plies to white men as well as black men." Cong. Globe, 39th Cong.,
1st Sess., p. 599. Opponents of the bill agreed with this construc-
tion of the first clause of the section, declaring that it referred to
the deprivation of constitutional rights of all inhabitants of the
states of every race and color. Pp. 598, 601.

So interpreted, § 20 applies to deprivation of the constitutional rights of qualified voters to choose representatives in Congress. The generality of the section, made applicable as it is to deprivations of any constitutional right, does not obscure its meaning or impair its force within

On February 24, 1870, Senator Stewart of Nevada, introduced S. 365, 41st Cong., 2d Sess., § 2 of which read:

"That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of white · persons, shall be deemed guilty of a misdemeanor. . . ."

In explaining the bill he declared, Cong. Globe, 41st Cong., 2d Sess., p. 1536, that the purpose of the bill was to extend its benefits to aliens, saying, "It extends the operation of the Civil Rights Bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States." The Committee reported out a substitute bill to H. R. 1293, to which S. 365 was added as an amendment. As so amended the bill when adopted became the present § 20 of the Criminal Code which read exactly as did § 2 of the Civil Rights Act, except that the word "aliens" was added and the word "citizens" was substituted for the phrase "white persons."

While the legislative history indicates that the immediate occasion for the adoption of § 20, like the Fourteenth Amendment itself, was the more adequate protection of the colored race and their civil rights, it shows that neither was restricted to the purpose and that the first clause of § 20 was intended to protect the constitutional rights of all inhabitants of the states. H. R. 1293, 41st Cong., 2d Sess., which was later amended in the Senate to include § 2 of S. 365 as § 17 of the bill as it passed, now § 20 of the Criminal Code, was originally entitled "A bill to enforce the right of citizens of the United States to vote in the several States of this Union, who have hitherto been denied that right on account of race, color, or previous condition of servitude." When the bill came to the Senate its title was amended and adopted to read, "A bill to enforce the right of citizens of the United States to vote in the several States of this Union and for other purposes."

the scope of its application, which is restricted by its terms to deprivations which are willfully inflicted by those acting under color of any law, statute and the like.

We do not discuss the application of § 20 to deprivations of the right to equal protection of the laws guaranteed by the Fourteenth Amendment, a point apparently raised and discussed for the first time in the Governmen 's brief in this Court. The point was not specially considered or decided by the court below, and has not been assigned as error by the Government. Since the indictment on its face does not purport to charge a deprivation of equal protection to voters or candidates, we are not called upon to construe the indictment in order to raise a question of statutory validity or construction which we are alone authorized to review upon this appeal.

*Reversed.*

The CHIEF JUSTICE took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

Free and honest elections are the very foundation of our republican form of government. Hence any attempt to defile the sanctity of the ballot cannot be viewed with equanimity. As stated by Mr. Justice Miller in *Ex parte Yarbrough,* 110 U. S. 651, 666, "the temptations to control these elections by violence and corruption" have been a constant source of danger in the history of all republics. The acts here charged, if proven, are of a kind which carries that threat and are highly offensive. Since they corrupt the process of Congressional elections, they transcend mere local concern and extend a contaminating influence into the national domain.

I think Congress has ample power to deal with them. That is to say, I disagree with *Newberry* v. *United States,* 256 U. S. 232, to the extent that it holds that Congress

has no power to control primary elections. Art. I, § 2 of the Constitution provides that "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States." Art. I, § 4 provides that "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." And Art. I, § 8, clause 18 gives Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Those sections are an arsenal of power ample to protect Congressional elections from any and all forms of pollution. The fact that a particular form of pollution has only an indirect effect on the final election is immaterial. The fact that it occurs in a primary election or nominating convention is likewise irrelevant. The important consideration is that the Constitution should be interpreted broadly so as to give to the representatives of a free people abundant power to deal with all the exigencies of the electoral process. It means that the Constitution should be read so as to give Congress an expansive implied power to place beyond the pale acts which, in their direct or indirect effect, impair the integrity of Congressional elections. For when corruption enters, the election is no longer free, the choice of the people is affected. To hold that Congress is powerless to control these primaries would indeed be a narrow construction of the Constitution, inconsistent with the view that that instrument of government was designed not only for contemporary needs but for the vicissitudes of time.

So I agree with most of the views expressed in the opinion of the Court. And it is with diffidence that I dissent from the result there reached.

The disagreement centers on the meaning of § 19 of the Criminal Code, which protects every right secured by the Constitution. The right to vote at a final Congressional election and the right to have one's vote counted in such an election have been held to be protected by § 19. *Ex parte Yarbrough, supra; United States* v. *Mosley,* 238 U. S. 383. Yet I do not think that the principles of those cases should be, or properly can be, extended to primary elections. To sustain this indictment we must so extend them. But when we do, we enter perilous territory.

We enter perilous territory because, as stated in *United States* v. *Gradwell,* 243 U. S. 476, 485, there is no common law offense against the United States; "the legislative authority of the Union must make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence." *United States* v. *Hudson,* 7 Cranch 32, 34. If a person is to be convicted of a crime, the offense must be clearly and plainly embraced within the statute. As stated by Chief Justice Marshall in *United States* v. *Wiltberger,* 5 Wheat. 76, 105, "probability is not a guide which a court, in construing a penal statute, can safely take." It is one thing to allow wide and generous scope to the express and implied powers of Congress; it is distinctly another to read into the vague and general language of an act of Congress specifications of crimes. We should ever be mindful that "before a man can be punished, his case must be plainly and unmistakably within the statute." *United States* v. *Lacher,* 134 U. S. 624, 628. That admonition is reëmphasized here by the fact that § 19 imposes not only a fine of $5,000 and ten years in prison, but also makes him who is convicted "ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States." It is not enough for us to find in the vague penumbra of a statute some offense about which Congress could have legislated, and then to particularize it as a crime because it is highly

offensive. Cf. *James* v. *Bowman,* 190 U. S. 127. Civil liberties are too dear to permit conviction for crimes which are only implied and which can be spelled out only by adding inference to inference.

Sec. 19 does not purport to be an exercise by Congress of its power to regulate primaries. It merely penalizes conspiracies "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Thus, it does no more than refer us to the Constitution[1] for the purpose of determining whether or not the right to vote in a primary is there secured. Hence we must do more than find in the Constitution the power of Congress to afford that protection. We must find that protection on the face of the Constitution itself. That is to say, we must in view of the wording of § 19 read the relevant provisions of the Constitution for the purposes of this case through the window of a criminal statute.

There can be put to one side cases where state election officials deprive negro citizens of their right to vote at a general election (*Guinn* v. *United States,* 238 U. S. 347), or at a primary. *Nixon* v. *Herndon,* 273 U. S. 536; *Nixon* v. *Condon,* 286 U. S. 73. Discrimination on the basis of race or color is plainly outlawed by the Fourteenth Amendment. Since the constitutional mandate is plain, there is no reason why § 19 or § 20 should not be applicable. But the situation here is quite different. When we turn to the constitutional provisions relevant to this case we find no such unambiguous mandate.

Art. I, § 4 specifies the machinery whereby the times, places and manner of holding elections shall be established and controlled. Art. I, § 2 provides that representatives shall be "chosen" by the people. But for purposes of the

---

[1] While § 19 also refers to "laws of the United States," § 19 and § 20 are the only statutes directly in point.

criminal law as contrasted to the interpretation of the Constitution as the source of the implied power of Congress, I do not think that those provisions in absence of specific legislation by Congress protect the primary election or the nominating convention. While they protect the right to vote, and the right to have one's vote counted, at the final election, as held in the *Yarbrough* and *Mosley* cases, they certainly do not *per se* extend to all acts which in their indirect or incidental effect restrain, restrict, or interfere with that choice. Bribery of voters at a general election certainly is an interference with that freedom of choice. It is a corruptive influence which for its impact on the election process is as intimate and direct as the acts charged in this indictment. And Congress has ample power to deal with it. But this Court in *United States* v. *Bathgate*, 246 U. S. 220, by a unanimous vote, held that conspiracies to bribe voters at a general election were not covered by § 19. While the conclusion in that case may be reconciled with the results in the *Yarbrough* and *Mosley* cases on the ground that the right to vote at a general election is personal while the bribery of voters only indirectly affects that personal right, that distinction is not of aid here. For the failure to count votes cast at a primary has by the same token only an indirect effect on the voting at the general election. In terms of causal effect, tampering with the primary vote may be as important on the outcome of the general election as bribery of voters at the general election itself. Certainly from the viewpoint of the individual voter there is as much a dilution of his vote in the one case as in the other. So, in light of the *Mosley* and *Bathgate* cases, the test under § 19 is not whether the acts in question constitute an interference with the effective choice of the voters. It is whether the voters are deprived of their votes in the general election. Such a test comports with the standards for construction of a criminal law, since it restricts § 19 to protection of

the rights plainly and directly guaranteed by the Constitution. Any other test entails an inquiry into the indirect or incidental effect on the general election of the acts done. But in view of the generality of the words employed, such a test would be incompatible with the criteria appropriate for a criminal case.

The *Mosley* case, in my view, went to the verge when it held that § 19 and the relevant constitutional provisions made it a crime to fail to count votes cast at a general election. That Congress intended § 19 to have that effect was none too clear. The dissenting opinion of Mr. Justice Lamar in that case points out that § 19 was originally part of the Enforcement Act of May 31, 1870, c. 114, § 6, 16 Stat. 140. Under another section of that act (§ 4), which was repealed by the Act of February 8, 1894 (28 Stat. 36), the crime charged in the *Mosley* case would have been punishable by a fine of not less than $500 and imprisonment for 12 months.[2] Under § 19 it carried, as it still does, a penalty of $5000 and ten years in prison. The Committee Report (H. Rep. No. 18, 53d Cong., 1st Sess.), which recommended the repeal of other sections, clearly indicated an intent to remove the hand of the Federal Government from such elections and to restore their conduct and policing to the states.

---

[2] Sec. 5506, Rev. Stat.: "Every person who, by any unlawful means, hinders, delays, prevents, or obstructs, or combines and confederates with others to hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to vote, or from voting at any election . . . shall be fined not less than five hundred dollars, or be imprisoned not less than one month nor more than one year, or be punished by both such fine and imprisonment." Sec. 5511 provided: "If, at any election for Representative or Delegate in Congress, any person . . . knowingly receives the vote of any person not entitled to vote, or refuses to receive the vote of any person entitled to vote . . . he shall be punished by a fine of not more than five hundred dollars, or by imprisonment not more than three years, or by both . . ."

As the Report stated (p. 7): "Let every trace of the reconstruction measures be wiped from the statute books; let the States of this great Union understand that the elections are in their own hands, and if there be fraud, coercion, or force used they will be the first to feel it. Responding to a universal sentiment throughout the country for greater purity in elections many of our States have enacted laws to protect the voter and to purify the ballot. These, under the guidance of State officers, have worked efficiently, satisfactorily, and beneficently; and if these Federal statutes are repealed that sentiment will receive an impetus which, if the cause still exists, will carry such enactments in every State in the Union." In view of this broad, comprehensive program of repeal, it is not easy to conclude that the general language of § 19, which was not repealed, not only continued in effect much which had been repealed but also upped the penalties for certain offenses which had been explicitly covered by one of the repealed sections. Mr. Justice Holmes, writing for the majority in the *Mosley* case, found in the legislative and historical setting of § 19 and in its revised form a Congressional interpretation which, if § 19 were taken at its face value, was thought to afford voters in final Congressional elections general protection. And that view is a tenable one, since § 19 originally was part of an Act regulating general elections, and since the acts charged had a direct rather than an indirect effect on the right to vote at a general election.

But as stated by a unanimous court in *United States* v. *Gradwell, supra,* p. 486, the *Mosley* case "falls far short" of making § 19 "applicable to the conduct of a state nominating primary." Indeed, Mr. Justice Holmes, the author of the *Mosley* opinion, joined with Mr. Justice McReynolds in the *Newberry* case in his view that Congress had no authority under Art. I, § 4 of the Constitution to legislate on primaries. When § 19

was part of the Act of May 31, 1870, it certainly would never have been contended that it embraced primaries, for they were hardly known at that time.[3]  It is true that "even a criminal statute embraces everything which subsequently falls within its scope."  *Browder* v. *United States,* 312 U. S. 335, 340.  Yet the attempt to bring under § 19 offenses "committed in the conduct of primary elections or nominating caucuses or conventions" was rejected in the *Gradwell* case, where this Court said that in absence of legislation by Congress on the subject of primaries it is not for the courts "to attempt to supply it by stretching old statutes to new uses, to which they are not adapted and for which they were not intended. . . . the section of the Criminal Code relied upon, originally enacted for the protection of the civil rights of the then lately enfranchised negro, cannot be extended so as to make it an agency for enforcing a state primary law."  243 U. S. pp. 488–489.  The fact that primaries were hardly known when § 19 was enacted, the fact that it was part of a legislative program governing general elections, not primary elections, the fact that it has been in nowise implemented by legislation directed at primaries, give credence to the unanimous view in the *Gradwell* case that § 19 has not by the mere passage of time taken on a new and broadened meaning.  At least it seems plain that the difficulties of applying the historical reason adduced by Mr. Justice Holmes in the *Mosley* case to bring general elections within § 19 are so great in case of primaries that we have left the safety zone of interpretation of criminal statutes when we sustain this indictment.  It is one thing to say, as in the *Mosley* case, that Congress was legislating as respects general elections when it passed § 19.  That was the fact.  It is quite

---

[3] Merriam & Overacker, Primary Elections (1928) chs. I–III, V; Sait, American Parties & Elections (1927) ch. X; Brooks, Political Parties & Electoral Problems (1933) ch. X.

another thing to say that Congress by leaving §. 19 unmolested for some seventy years has legislated unwittingly on primaries. Sec. 19 was never part of an act of Congress directed towards primaries. That was not its original frame of reference. Therefore, unlike the *Mosley* case, it cannot be said here that § 19 still covers primaries because it was once an integral part of primary legislation.

Furthermore, the fact that Congress has legislated only sparingly and at infrequent intervals even on the subject of general elections (*United States* v. *Gradwell, supra*) should make us hesitate to conclude that by mere inaction Congress has taken the greater step, entered the field of primaries, and gone further than any announced legislative program has indicated. The acts here charged constitute crimes under the Louisiana statute. La. Act No. 46, Reg. Sess. 1940, § 89. In absence of specific Congressional action we should assume that Congress has left the control of primaries and nominating conventions to the states—an assumption plainly in line with the Committee Report, quoted above, recommending the repeal of portions of the Enforcement Act of May 31, 1870 so as to place the details of elections in state hands. There is no ground for inference in subsequent legislative history that Congress has departed from that policy by superimposing its own primary penal law on the primary penal laws of the states. Rather, Congress has been fairly consistent in recognizing state autonomy in the field of elections. To be sure, it has occasionally legislated on primaries.[4] But even when dealing specifically with the nominating process, it has never made acts of the kind here in question a crime. In this connection it should be noted that the bill which became the Hatch Act (53 Stat. 1147; 18 U. S. C. § 61)

---

[4] Act of June 25, 1910, c. 392, 36 Stat. 822, as amended by the Act of August 19, 1911, c. 33, 37 Stat. 25; Act of October 16, 1918, c. 187, 40 Stat. 1013.

contained a section which made it unlawful "for any person to intimidate, threaten, or coerce, or to attempt to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the nomination of any party as its candidate" for various federal offices, including representatives, *at any primary or nominating convention* held solely or in part" for that purpose. This was stricken in the Senate. 84 Cong. Rec., pt. 4, 76th Cong., 1st Sess., p. 4191. That section would have extended the same protection to the primary and nominating convention as § 1 of the Hatch Act[5] extends to the general election. The Senate, however, refused to do so. Yet this Court now holds that § 19 has protected the primary vote all along and that it covers conspiracies to do the precise thing on which Congress refused to legislate in 1939. The hesitation on the part of Congress through the years to enter the primary field, its refusal to do so [6] in 1939, and the restricted scope of such primary laws as it has passed, should be ample evidence

[5] "That it shall be unlawful for any person to intimidate, threaten, or coerce, or to attempt to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, or Member of the House of Representatives at any election held solely or in part for the purpose of selecting a President, a Vice President, a Presidential elector, or any Member of the Senate or any Member of the House of Representatives, Delegates or Commissioners from the Territories and insular possessions."

[6] Sec. 2 of the Hatch Act, however, does make unlawful certain acts of administrative employees even in connection with the nominations for certain federal offices. And see 54 Stat. 767, No. 753, ch. 640, 76th Cong., 3d Sess. As to the power of Congress over employees or officers of the government, see *United States* v. *Wurzbach*, 280 U. S. 396.

. that this Court is legislating when it takes the initiative in extending § 19 to primaries.

We should adhere to the strict construction given to § 19 by a unanimous court in *United States* v. *Bathgate,* 246 U. S. 220, 226, where it was said: "Section 19, Criminal Code, of course, now has the same meaning as when first enacted . . . and considering the policy of Congress not to interfere with elections within a State except by clear and specific provisions, together with the rule respecting construction of criminal statutes, we cannot think it was intended to apply to conspiracies to bribe voters." That leads to the conclusion that § 19 and the relevant constitutional provisions should be read so as to exclude all acts which do not have the direct effect of depriving voters of their right to vote at general elections. That view has received tacit recognition by Congress. For the history of legislation governing Federal elections shows that the occasional Acts of Congress [7] on the subject have been primarily directed towards supplying detailed regulations designed to protect the individual's constitutional right to vote against pollution and corruption. Those laws, the latest of which is § 1 of the Hatch Act, are ample recognition by Congress itself that specific legislation is necessary in order to protect the electoral process against the wide variety of acts which in their indirect or incidental effect interfere with the voter's freedom of choice and corrupt the electoral process. They are evidence that detailed regulations are essential in order to reach acts which do not directly interfere with the voting privilege. They are inconsistent with the notions in the opinion of the

---

[7] See for example, Act of May 31, 1870, 16 Stat. 140; Act of July 14, 1870, 16 Stat. 254, 255–256; Act of Feb. 28, 1871, 16 Stat. 433; Act of June 25, 1910, 36 Stat. 822; Act of August 19, 1911, 37 Stat. 25; Act of August 23, 1912, 37 Stat. 360; Act of October 16, 1918, 40 Stat. 1013; Federal Corrupt Practices Act, 1925, 43 Stat. 1070; Hatch Act, August 2, 1939, 53 Stat. 1147.

Court that the Constitution, unaided by definite supplementary legislation, protects the methods by which party candidates are nominated.

That § 19 lacks the requisite specificity necessary for inclusion of acts which interfere with the nomination of party candidates is reëmphasized by the test here employed. The opinion of the Court stresses, as does the indictment, that the winner of the Democratic primary in Louisiana invariably carries the general election. It is also emphasized that a candidate defeated in the Louisiana primaries cannot be a candidate at the general election. Hence, it is argued that interference with the right to vote in such a primary is "as a matter of law and in fact an interference with the effective choice of the voters at the only stage of the election procedure when their choice is of significance," and that the "primary in Louisiana is an integral part of the procedure for the popular choice" of representatives. By that means, the *Gradwell* case is apparently distinguished. But I do not think it is a valid distinction for the purposes of this case.

One of the indictments in the *Gradwell* case charged that the defendants conspired to procure one thousand unqualified persons to vote in a West Virginia primary for the nomination of a United States Senator. This Court, by a unanimous vote, affirmed the judgment which sustained a demurrer to that indictment. The Court specifically reserved the question as to whether a "primary should be treated as an election within the meaning of the Constitution." But it went on to say that, even assuming it were, certain "strikingly unusual features" of the particular primary precluded such a holding in that case. It noted that candidates of certain parties were excluded from the primary, and that even candidates who were defeated at the primary could on certain conditions be nominated for the general election. It therefore concluded that whatever power Congress might have to control such primaries, it had not done so by § 19.

If the *Gradwell* case is to survive, as I think it should, we have therefore this rather curious situation. Primaries in states where the winner invariably carries the general election are protected by § 19 and the Constitution, even though such primaries are not by law an integral part of the election process. Primaries in states where the successful candidate never wins, seldom wins, or may not win in the general election are not so protected, unless perchance state law makes such primaries an integral part of the election process. Congress, having a broad control over primaries, might conceivably draw such distinctions in a penal code. But for us to draw them under § 19 is quite another matter. For we must go outside the statute, examine local law and local customs, and then, on the basis of the legal or practical importance of a particular primary, interpret the vague language of § 19 in the light of the significance of the acts done. The result is to make refined and nice distinctions which Congress certainly has not made, to create unevenness in the application of § 19 among the various states, and to make the existence of a crime depend, not on the plain meaning of words employed interpreted in light of the legislative history of the statute, but on the result of research into local law or local practices. Unless Congress has explicitly made a crime dependent on such facts, we should not undertake to do so. Such procedure does not comport with the strict standards essential for the interpretation of a criminal law. The necessity of resorting to such a circuitous route is sufficient evidence to me that we are performing a legislative function in finding here a definition of a crime which will sustain this indictment. A crime, no matter how offensive, should not be spelled out from such vague inferences.

MR. JUSTICE BLACK and MR. JUSTICE MURPHY join in this dissent.