William **BROWN** et al., Appellants,

v.

Lawrence **O'BRIEN** et al.

Thomas E. **KEANE** et al., Appellants,

v.

**NATIONAL DEMOCRATIC PARTY** et al.

Thomas E. **KEANE**

v.

**NATIONAL DEMOCRATIC PARTY** et al., Appellants.

Thomas E. **KEANE** et al.

v.

**NATIONAL DEMOCRATIC PARTY** et al.

William Cousins et al., Appellants.

Nos. 72–1628 to 72–1631.

United States Court of Appeals, District of Columbia Circuit.

July 5, 1972.

As Amended Aug. 10, 1972.

Judgment Vacated Oct. 10, 1972.
See 93 S.Ct. 67.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. William A. Dobrovir, Geoffrey Cowan, and Lewis J. Paper, Washington, D. C., were on the pleading, for appellants in No. 72–1628.

Mr. Joseph A. Califano, Jr., Washington, D. C., for appellees in No. 72–1628.

Mr. Jerome H. Torshen, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Mr. Jerry S. Cohen, Washington, D. C., was on the pleading, for appellants in No. 72–1629 and appellees in No. 72–1630 and No. 72–1631.

Mr. Joseph A. Califano, Jr., Washington, D. C., with whom Messrs. John G. Kester and Richard M. Cooper, Washington, D. C., were on the pleadings, for appellants in No. 72–1630 and appellees in No. 72–1629.

Mr. Wayne W. Whalen, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, for appellants in No. 72–1631.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and MacKINNON, Circuit Judge.

## PER CURIAM:

These two cases, which have come before us on motions for summary reversal and expedited consideration, call into question the power of the Democratic Party to exclude from its 1972 national convention certain challenged delegates from California and Illinois. In both cases delegates unseated by action of the Credentials Committee of the national convention assert that they were expelled in violation of rights guaranteed by the Constitution. The District Court dismissed the complaints in both cases, upholding the action of the Credentials Committee. In No. 72–1630 we affirm the District Court's judgment dismissing the complaint of Illinois plaintiffs, and, for the reasons set forth below, we remand the case to the District Court for entry of an order barring these plaintiffs from taking action in any other court that would impair the effectiveness and the integrity of the judgment of this Court. In No. 72–1628 we reverse the judgment of the District Court and remand the case to that court for entry of an order declaring defendants' action null and void, and enjoining defendants from excluding these elected California delegates because of their selection in a winner-take-all primary.

## I.

### The California Challenge

California plaintiffs are 151 persons who ran in a statewide primary election on June 6, 1972, as part of a 271 person slate committed to the presidential candidacy of Sen. George McGovern of South Dakota. Sen. McGovern won the California primary with a plurality of the vote, roughly 43 per cent, and under the winner-take-all provision of the California primary election law,[1] the entire 271 person slate was designated as the California delegation to the national convention. A challenge was then brought against the California delegation on the grounds that the winner-take-all feature of the California primary law was invalid under rules adopted by the Democratic Party in 1971—the so-called McGovern Commission guidelines. The hearing examiner appointed by the Credentials Committee rejected the challenge and it was renewed before the full Committee on June 29, 1972. At that time the challengers apparently dropped the allegation that winner-take-all was inconsistent with the McGovern guidelines, and maintained that it violated the mandate of the 1968 convention. With California's representatives on the Credentials Committee not voting, because their delegation was under challenge, the credentials committee passed by a six vote majority the following resolution:

WHEREAS the 1968 Convention guaranteed to all Democrats, a "full, meaningful and timely opportunity" to participate in the delegate selection procedures of our party, and

WHEREAS the California winner-take-all primary election held on June 6, 1972 denied that opportunity to participate to almost two million Democratic voters, and

WHEREAS the California winner-take-all primary functionally disenfranchised 56% of the California Democratic electorate who did not vote for George McGovern, and

WHEREAS the California winner-take-all primary awarded 100% of the delegate votes of the State of California to the McGovern slate, while awarding no delegates to other candidates who received votes of California Democrats—Humphrey, Muskie, Wallace, Chisholm, Jackson, McCarthy, Lindsay and Yorty—in spite of the fact that proportional representation is an integral party of the 1968 reform mandate of the Democratic National Convention, and

WHEREAS a majority of the California Democratic electorate will have no representation or voice in the 1972 Democratic National Convention under the proposed California delegation of Senator McGovern, in contradiction to the entire trust and spirit of Party reform in the Democratic Party over the last four years, now therefore,

BE IT RESOLVED by the Credentials Committee of the 1972 Democratic National Convention, that the California delegation not be seated as presently constituted, that a delegation apportioned on the basis of proportional representation be substituted in its place, that the formula for this representation be directly proportional to the votes cast by the Democratic voters of the State of California in the June 6, 1972 primary, that this voting results in the election of 106 Humphrey delegates, 16 Wallace delegates, 12 Chisholm delegates, 6 Muskie delegates, 4 Yorty delegates, 3 McCarthy delegates, 2 Jackson delegates, 2 Lindsay delegates,

1. See Calif.Elections Code §§ 6300–6393, and in particular § 6386.

and 120 McGovern delegates, and the appropriate number of alternate delegates in all cases, and BE IT FURTHER RESOLVED that those delegate positions be filled by an open and representative procedure—in the case of 120 McGovern delegates, a caucus of the 271 individuals on the McGovern slates, for all other candidates with the exception of Governor Wallace, a caucus of the respective California slates, and for the Wallace positions, an open caucus to be held in the State of California, with adequate public notice, not later than July 5, 1972, that all delegates included on the California delegation as reconstituted be selected consistent to the A1 and A2 provisions of the Call for the 1972 Democratic National Convention which calls for reasonable representation of women, youth and minorities, so that the % of these groups, blacks and chicanos does not decrease, and that the names of all members of this newly constituted and equitable California delegation be presented to the Secretary of the Democratic National Committee before July 7, 1972 who will certify such names as the California delegation to the 1972 National Convention.

In their complaint, the excluded California delegates assert that their expulsion was in violation of, inter alia, their constitutional right to due process of law. We have no difficulty concluding that defendants' action against these delegates was state action. See Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Georgia v. National Democratic Party, 145 U.S.App.D.C. 102, 447 F.2d 1271, cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). We also conclude, for the reasons described below, that expulsion of these 151 California delegates was inconsistent with fundamental principles of due process.

At the heart of the controversy in these two cases are the guidelines on delegate selection promulgated by the McGovern Commission in April, 1970, and adopted by the Democratic National Committee in February, 1971. One of these guidelines, B–6, deals with the representation of minority views on presidential candidates at each stage of the delegate selection process. That guideline urges State Parties to adopt procedures which will provide fair representation of minority views. But the guideline explicitly stops short of abolishing the winner-take-all provision. Thus, the examiner who initially heard the challenge to the California delegation made findings as follows:

4. The parties stipulated during the hearing that the McGovern Commission gave full and careful consideration to requiring the abolition of the winner-take-all concept at least at the state level, and decided not make its abolition mandatory. The other evidence presented at the hearing confirmed this stipulation.

5. The language of Guideline B–6 itself supports the stipulation. In contrast to other Guidelines, it uses the word "urges" instead of the word "requires" with respect to the proceedings specified.

Plaintiffs also submitted an affidavit indicating that at a meeting of the McGovern Commission on November 19, 1969, a Commission member proposed that the guidelines "require" the abolition of winner-take-all provisions for 1972. The proposal was apparently defeated by a vote of 13 to 3. The understanding that winner-take-all was still a viable concept for the 1972 convention was also reflected in *The Call for the 1972 Democratic Convention*. The Call incorporates the resolution of the Democratic National Committee adopting the McGovern guidelines, and it reiterates the distinction between guidelines which the State Parties are "required" to adopt, and those which they are "urged" to adopt.

The hearing examiner also found that the State Democratic Party of California relied on representations made by authoritative spokesmen for the national party. The examiner indicated that:

6. Congressman Donald A. Fraser and Robert Nelson of the Commission on Party Structure and Delegate Selection testified to negotiations with the California Democratic Party on compliance with the Guidelines. With respect to B–6 their testimony was that although California was urged in the early part of the negotiations to take steps to abandon the winner-take-all primary, it was assumed at all times that that was not a requirement for compliance with the Guidelines for the 1972 Convention.

7. The final letter from Congressman Fraser to Mr. Stephen Reinhardt of California, dated April 28, 1971 (Challengers Exhibit G) states (page 2):

"Although Guideline B–6 'urges' state parties to adopt procedures which provide for fair representation of minority views on presidential candidates, it does not require that the winner-take-all statewide primary be abolished in selecting delegates. Therefore it is permissible to use this system in California in 1972."

8. In a letter dated February 1, 1972, (Respondents Exhibit 5) from Lawrence O'Brien to Mr. Charles T. Manatt, Democratic State Chairman, Mr. O'Brien said that "the Fraser Commission informs me that the California Party is in full compliance with the Guidelines." This was confirmed in a similar letter to Mr. Manatt, dated February 7, 1972, from Robert W. Nelson, Staff Director of the Commission (Respondents Exhibit 6).

9. The evidence establishes that all interested persons and organizations, including the candidates, acted in reliance on the fact that Guideline B–6 did not outlaw the winner-take-all statewide primary as a method of delegate selection in 1972.

Conceding no support for their action in the Call to the Convention or the McGovern guidelines, defendants would justify the expulsion of these delegates solely on the Credentials Committee's construction of the resolution adopted by the 1968 national convention. That resolution, which initiated the process of reform and provided the mandate of the McGovern Commission's action, stated:

Be it resolved, that the call to the 1972 National Democratic Convention shall contain the following language:

It is understood that a State Democratic Party in selecting and certifying delegates to the National Convention thereby undertakes to assure that such delegates have been selected through a process in which all Democratic voters have had a full and timely opportunity to participate.

In determining whether a state party has complied with this mandate, the Convention shall require that:

(1) The unit rule not be used in any stage of the delegate selection process, and

(2) All feasible efforts have been made to assure that delegates are elected through party primary, convention or committee procedures, open to public participation within the calendar year of the National Convention.

Defendants now seek to characterize the action of the Credentials Committee as reflecting a determination that "insofar as Guideline B–6 permits the selection of delegates on a winner-take-all basis, in disregard of the views of minorities within the state parties, it is invalid under the mandate of the 1968 Convention and therefore is of no force or effect." Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss, July 3, 1972, at 38.

Plaintiffs respond—in our view, with great force—that nothing in the 1968 resolution can reasonably be seen as a prohibition of winner-take-all provisions. They point out that (1) the resolution specifically bars the unit rule, but makes no mention of the winner-take-all concept; (2) the resolution has been consistently interpreted since 1968 as not requiring abolition of winner-take-all, and assurances to that effect were repeatedly offered to the California state party; (3) the 1968 *Report of the Commission on the Democratic Selection of Presidential Nominees* (Hughes Commission), a critical part of the "legislative history" of the 1968 resolution, gives no indication that abolition of winner-take-all was a part of the 1968 reform package. On the contrary, while laying the groundwork for the convention resolution and the McGovern Commission, the report of the Hughes Commission clearly states that:

> [t]he Commission does not, however, flatly condemn the winner-take-all principle in state primaries, since such primaries offer a useful device for engaging popular interest and involvement in the process of selecting a President.

Report at 19.

██ In resolving this question we begin with a firm conviction that the political parties must have wide latitude in interpreting their own rules and regulations. And we recognize that this latitude must be especially wide where, as here, a reviewing court is hampered by severe shortage of time which prevents a prolonged inquiry into the meaning of the rules. But on the basis of the record now before us and the argument we have heard, we are compelled to conclude: (1) that the provision of the 1968 resolution invoked to justify the exclusion of these delegates is vague and indeterminate—requiring this action, if at all, only by innuendo; (2) that nothing in the statements made at the time of the adoption of that resolution or in its subsequent interpretation by the Guidelines and party officials suggests that it was ever understood to enact a ban on winner-take-all; (3) that plaintiffs and the State of California acted in justifiable reliance on the continuously reiterated assurances of Democratic Party officials that winner-take-all was not proscribed; and (4) that the Democratic Party did not merely interpret one of its rules—in essence, it acted in defiance of its own rules as interpreted in the Call for the 1972 Convention by establishing retroactively an entirely new and unannounced standard of conduct.

The question remains, therefore, whether the Constitution bars the Democratic Party from changing the rules after the election has been held. We recognize that some consider the change adopted by the Party to be a laudable one and the direction of recent attempts at Democratic Party reform is quite plainly toward the principle of proportional representation and maximum participation of minority views. But the process by which that result is reached is necessarily as important as the result itself. We cannot be blind to the fundamental deficiencies in the fairness of the process of reaching that result. Nor can we overlook the injuries to which those deficiencies gave rise.

██ If the party had adopted a ban on winner-take-all prior to the California primary election, the candidates might have campaigned in a different manner, devoting more or less time and resources to the state. Voters might have cast their ballots for a different candidate;[2] and the State of California might have enacted an alternative delegate selection scheme that would comply

---

2. It has been suggested, for example, that voters who cast ballots for one of the front-runners in the race might have voted for another candidate if they had been aware that delegates would be divided in proportion to votes. Plaintiffs also suggest that certain presidential candidates may have dropped out of the race on the assumption that only the winner would be awarded any delegates.

with party rules and that might be more responsive to its own state interests than the pure proportionality of representation that was imposed by the Credentials Committee.[3] The interests of the political candidates, the voters of California, and the State of California are plainly substantial, and the injury to these interests might itself require our intervention. But the fundamental basis of our action is the grave injury to the fairness and legitimacy of the process of electing the President of the United States. As a nation we can tolerate, and even welcome, disputes about the merits of different rules which might govern the election of the President. It may well be, for example, that direct election of the President is more fair than indirect election by the electoral college, and that distribution of delegates in proportion to votes received by the candidates they represent is more fair than winner-take-all. These are questions about which reasonable men can differ. But there can be no dispute that the very integrity of the process rests on the assumption that clear rules will be established and that, once established, they will be enforced fairly, consistently, and without discrimination so long as they remain in force. The decision of the Party to exclude these 151 delegates, who were elected in compliance with each of the party's applicable rules then in force, jeopardizes the integrity of the election process, and it therefore injures every voter in the United States and every individual and institution which is subject to the authority of the President. Because we are convinced that the process of electing the President of the United States is not, and cannot be, placed outside the rule of law, we set aside the arbitrary and unconstitutional action of the Democratic Party.[4] The case is remanded to the District Court for entry of an order declaring defendants' action against these plaintiffs null and void, and enjoining defendants from unseating these duly qualified and elected delegates to the national convention because they were selected in a winner-take-all primary election.

## II.

### The Illinois Challenge

The Illinois case involves a challenge to the seating of a group of 59 uncommitted delegates elected pursuant to state law, from various congressional districts in Northern Illinois.

After the Illinois delegate primary was held on March 21, 1972, a challenge was filed to the seating of the delegates in question on the ground that several of the guidelines of the Democratic National Party promulgated by the McGovern Commission in April, 1970, had been violated. The complaint before the Credentials Committee was based on asserted violations of rules A–1, A–2, C–4 and C–6. These rules deal with the requirements that State Democratic Parties make the delegate selection process an open and fair one.

After a lengthy hearing, the Hearing Examiner selected by the Credentials Committee to hear the complaint issued findings of fact. His decision upheld the challengers' contention with respect to each of the guidelines in question. The Credentials Committee voted to accept the Hearing Examiner's report in total; to unseat the challenged delegates; and to seat an alternative slate of delegates.

---

3. Thus, the State of California might have enacted a scheme whereby delegates are divided by congressional district, with all of the delegates for each district being awarded to the candidate who obtained the most votes in that district. See guideline B–6.

4. Plaintiffs argue that their exclusion violated not only their rights to due process of law but also to equal protection of the laws. They assert that delegates from twelve states were selected pursuant to some variant of the winner-take-all principle, and they protest the application of this new rule against only the California delegation. In view of our resolution of the due process contention, we express no opinion on the merits of the equal protection argument.

This suit was thereafter instituted as a class action in the District Court, on behalf of the 50 challenged delegates and the voters they represent. The complaint sought to overturn the decision of the Credentials Committee on the grounds that its action violated the constitutional rights of the 59 delegates.[5] The challenged delegates sought a declaration that each of the guidelines, as applied to them, was unconstitutional; and an injunction reinstating them as delegates to the 1972 convention.

After a hearing, the District Court denied the request for an injunction. In so ordering, the court found that the action of the Credentials Committee with respect to guidelines A–5 and C–6 did not pose any deprivation of constitutional rights. In addition, the Court readopted its findings of June 19, which had been vacated by this court on the ground of prematurity. *See* note 5 *supra*. Those findings held certain of the guidelines unconstitutional.

The Illinois delegation recognizes that in order to prevail, it must sustain its assertion that each of the grounds relied on by the Hearing Examiner, and in turn by the Credentials Committee, is unconstitutional. They have not met that burden. The District Court's determination that there exists a valid basis for the action of the Credentials Committee, insofar as it is based on Guideline C–6, is hereby affirmed.

Guideline C–6 states:

-C–6 Slate-making

In mandating a full and meaningful opportunity to participate in the delegate selection process, the 1968 Convention meant to prohibit any practice in the process of selection which made it difficult for Democrats to participate. Since the process by which individuals are nominated for delegate positions and slates of potential delegates are formed is an integral and crucial part of the process by which delegates are actually selected, the Commission requires State Parties to extend to the nominating process all guarantees of full and meaningful opportunity to participate in the delegate selection process. When State law controls, the Commission requires State Parties to make all feasible efforts to repeal, amend or otherwise modify such laws to accomplish the stated purpose.

Furthermore, whenever slates are presented to caucuses, meetings, conventions, committees, or to voters in a primary, the Commission requires State Parties to adopt procedures which assure that:

1. the bodies making up the slates have been elected, assembled, or appointed for the slate-making task with adequate public notice that they would perform such task;

2. those persons making up each slate have adopted procedures that will facilitate widespread participation in the slate-making process, with the proviso that any slate presented in the name of a presidential candidate in a primary State be assembled with due consultation with the presidential candidate or his representative.

3. adequate procedural safeguards are provided to assure that the right to challenge the presented slate is more than perfunctory and places no undue burden on the challengers.

---

5. The plaintiffs in this case had filed a suit in the District Court, seeking essentially the same relief as sought here, prior to the ruling of the Hearing Examiner. The District Court issued an order at that time which reached the merits of the constitutional claims raised in the complaint. On appeal, this court vacated the District Court's order on the ground that because no action adverse to plaintiffs had yet been taken, the suit was premature. The case now under consideration was consolidated by the District Court with the prior suit. Since the Credentials Committee has already acted, the controversy is now ripe for adjudication.

When State law controls, the Commission requires State Parties to make all feasible efforts to repeal, amend or otherwise modify such laws to accomplish the stated purpose.

■ The process by which candidates for an office are endorsed can be just as integral a part of the ultimate election as is the election itself. The Supreme Court established that principle in Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), and it applies as well with respect to the process for choosing convention delegates. The Democratic National Party determined to make participation in the nomination process as democratic as possible. This exercise of the Party's power over the qualifications of the delegates to its convention was pursuant to a reasonable regulation calculated to achieve a permissible, indeed laudable, end. The action of the Credentials Committee was taken on the basis of a clear and constitutional rule which avoided the problem of vagueness found in the application of Guideline B–6 or the mandate of the 1968 convention to ban 'winner take all' primaries. Moreover, this rule had been announced —and understood—as applicable to the selection of delegates prior to the election process.

■ The challenged delegates claim that the Democratic National Party cannot abridge their right under Illinois law to the delegate seats for which they have been elected. The relationship, in this case, between the Illinois law and the Party's regulations offers no grounds for relief to the challenged delegation. No violation of Illinois law is at issue here. The Illinois election law is, by itself, not incompatible with guideline C–6 of the McGovern Commission. The guideline complements the Illinois law in an area—selection of delegate slates—where the state law is silent. The right of a national political party to determine the qualifications of delegates to its conventions, if exercised within the confines of the Constitution, cannot be defeated merely because an individual delegate has not violated a state law in addition to a valid party regulation. To hold otherwise would severely limit the freedom of association of the party itself.

Enforcement of Guideline C–6 is thus a permissible exercise of the power of the Credentials Committee. Since the action of the District Court was properly based on its conclusion that no constitutional violation existed in the application of Guideline C–6 to the 59 Illinois delegates, Judges Bazelon and Fahy do not find it necessary to the disposition of this appeal to reach the issues the District Court decided in the other parts of its order, and they express no opinion on the validity of the reasoning or conclusions of the District Court.[6]

Judge MacKinnon would additionally reach, and affirm, that portion of Judge Hart's order finding that Guidelines A–1 and A–2 are unconstitutional insofar as they might be interpreted to require imposition of quotas on the composition of any delegation. The Illinois challengers have sought to justify these two Guidelines by arguing that they do not impose rigid quotas based on race, sex, age or national origin, but rather that

6. Although Judges Bazelon and Fahy do not reach the question of the constitutionality of the action of the Credentials Committee based on rules A–1 and A–2, they find nothing in the order of the District Court which declares those rules unconstitutional. Paragraph 3 of the District Court's order of June 19, reissued on July 3, declares unconstitutional the use of any *quota* requirement to exclude a group of delegates. By their own terms, guidelines A–1 and A–2 do *not* require a quota. All that they require is that in order to remedy past discrimination, State Democratic Parties take affirmative action to increase the participation of certain groups in Party affairs. Paragraph 4 of the District Court's order expressly approved such a requirement, and the use of an exclusion sanction to enforce it. Judges Bazelon and Fahy read Judge Hart's order to say only that guidelines A–1 and A–2 could be unconstitutional *as applied*, if they were used to justify the imposition of a quota.

they constitute an exhortation to the State Parties to take strong affirmative action to ensure that these segments of the population are represented in the Presidential nominating process in roughly the same proportions as they exist in the general population. Judge MacKinnon believes this argument somewhat disingenuous, and would conclude that to the extent that the guidelines obviously do create some required preferences for such groups they do represent the imposition of quotas which are a denial of equal protection of the laws to those groups that are fenced out. Believing that quotas are thus to some extent being imposed by the Credentials Committee pursuant to guidelines A–1 and A–2, Judge MacKinnon would distinguish the judicial precedents upholding such affirmative action programs in the area of employment. *See e. g.*, Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L. Ed.2d 367 (1971); Contractors Ass'n v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). The Democratic National Party relies heavily on Carter, in which Judge Gibson, writing for the Eighth Circuit sitting en banc, states:

> The absolute preference ordered by the trial court would operate as a present infringement on those non-minority group persons who are equally or superiorly qualified for the fire fighter's positions; and we hesitate to advocate implementation of one constitutional guarantee by the outright denial of another.

452 F.2d at 330. Yet this acknowledged violation of the Equal Protection Clause was justified on the basis that it was necessary to provide a remedy for practices which operated to deny the constitutional right to be free from racial discrimination in employment. Judge MacKinnon considers the Illinois election laws do not operate in a manner which deprives any individual of any race, sex, age, etc. from the right to participate in any Illinois election as a candidate or elector for any office. Absent any violation of constitutional rights in the conduct of elections in Illinois, he would find no justification for an affirmative action program here and would accordingly conclude that Guidelines A–1 and A–2 unconstitutionally deny equal protection without the necessity for doing so to protect other constitutional rights.

### III.
### The Illinois Counter-Claim

The National Democratic Party appeals from the denial of their counterclaim against the Illinois plaintiffs seeking declaratory and injunctive relief barring futher prosecution of an Illinois state court action previously brought by the plaintiffs against the Illinois challengers. In that state proceeding the plaintiffs sought a declaration that they were the duly elected delegates to the 1972 National Convention, and an injunction against the challengers from taking any action that would interfere with the plaintiffs' functioning as delegates to the Convention. Judge Hart based his denial of the counterclaim on the grounds that the question of the legality of the slate certified by the Credentials Committee in lieu of the plaintiffs was not before him, and that there was no justiciable issue presented in this action concerning the eligibility of the members of that slate to represent the Illinois districts in question.

In so ruling Judge Hart seems to have focused solely on the state law claims which apparently are the basis of the state proceeding, and which were not before the District Court here. However, in approving the actions of the Credentials Committee in unseating the Illinois plaintiffs and seating an alternative delegation, we have acknowledged the National Party's right to impose requirements on the delegate selection process separate from and in addition to those imposed by State law. Proper res-

olution of the ultimate issues raised in the state proceeding would thus require consideration of both sets of requirements, and the interests of judicial efficiency, coupled with the rapidly expiring time remaining before the start of the Convention, call for resolution of those issues in one forum. At present the Illinois plaintiffs and the challengers are both parties to the state litigation and to these proceedings; thus their respective interests could be resolved in either forum and the ordinary principles of federalism and comity might be thought to require us to deny an injunction against the state proceeding. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and companion cases. But this counterclaim is brought by the National Party, whose interest in the ultimate resolution of the questioned qualifications of the Illinois delegation is clear, yet who is not a party in the state litigation. Their presence in this forum, brought here as defendants in a suit initiated by the same class of plaintiffs who are the plaintiffs in the state proceeding, provides us with justification for enjoining further prosecution of that state court proceeding.

In taking this step, we must first be careful to ensure that the requirements for such an injunction are fully met. Two types of requirements must be met; the express language of 28 U.S.C. § 2283, and the doctrines of equity, comity and federalism as recently articulated in *Younger, supra,* and its companion cases. Section 2283 provides that:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

We find that either the first or third exception to § 2283 authorizes us to enjoin further prosecution by the plaintiffs of their Illinois state suit.

■ The National Party alleges in its Counterclaim that its First Amendment right of association would be infringed by a state court declaration contradictory to the decision of the Credentials Committee to seat a delegation consisting of delegates other than plaintiffs. The Party thus grounds the jurisdiction of its Counterclaim on 42 U.S.C. § 1983 which authorizes a "suit in equity" to redress the deprivation "of any rights, privileges and immunities secured by the Constitution." In Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the Supreme Court expressly held that an action brought under § 1983 is one "expressly authorized by Act of Congress" and is thus within the first exception to § 2283's prohibition against enjoining state proceedings.

We also consider that an injunction is necessary to protect and effectuate our judgment upholding the action of the Credentials Committee here. The Resolution of the Committee which we have here approved provides that the 59 plaintiffs in this suit are not to be seated as the delegates to the Convention from their districts in Illinois. It also provides that 59 other persons shall be seated as the delegates from those districts. In order to protect our judgment approving this Resolution, it is necessary to enjoin plaintiffs from taking any action in any other court that would impair the effectiveness and the integrity of the judgments of this Court.

■ Finally we must consider whether the fundamental policy against federal interference in state litigation so strongly reaffirmed in *Younger,* with respect to criminal prosecutions, 401 U.S. at 46, 91 S.Ct. 746, bars our taking this action in the civil suit presently before us. We conclude that it does not. In *Mitchum, supra,* the Court described its holding in Younger as follows:

> [t]he Court clearly left room for federal injunctive intervention in a pending state court prosecution *in certain exceptional circumstances*—where irreparable injury is "both great and immediate," 401 U.S., at 46, 91 S.Ct.,

at 751 . . . or where there is a showing of "bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief." 401 U.S., at 54, 91 S.Ct., at 755. In the companion case of Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701, the Court said that ". . . perhaps *in other extraordinary circumstances* where irreparable injury can be shown . . . federal injunctive relief against pending state prosecutions [is] appropriate." 401 U.S., at 85, 91 S.Ct., at 677.

407 U.S. at 230, 92 S.Ct. at 2156. (emphasis added and original quotation shortened).

Irreparable injury, "both great and immediate," are clearly shown here. If plaintiffs were successful in their state proceeding one likely result would be that no delegates from the challenged Illinois districts could be seated at the Convention. Such a result would not just deprive the National Party of the participation of those persons whom it has selected to fill those delegate seats, more fundamentally it would deprive all Democrats residing in those districts of any voice or representation in the process by which their party's candidate for the Presidency is selected. The immediacy of this injury is clear—the Convention begins in five days—and after that the injury is wholly irreparable.

▬ We also consider that the unique situation presented by these two cases, all interested parties represented in the federal forum and a critical party missing from the state forum; this court's familiarity with the complex of issues involved—bred and nurtured in the consideration of both the California and Illinois challenges; both actions commenced in the separate forums by the same class of plaintiffs; and the rapidly expiring time within which any judicial action is possible—amply provide the extraordinary and unusual circumstances that call for equitable relief.

For the foregoing reasons we reverse the District Court's denial of the National Party's Counterclaim, and we accordingly enjoin the Illinois plaintiffs from taking action in any other Court that would impair the effectiveness and the integrity of the judgments of this Court.

IV.

Accordingly, the motion for summary reversal in No. 72–1629 is denied; the motions for summary reversal in Nos. 72–1630, 72–1631 and 72–1628 are granted and the cases are remanded to the District Court for the entry of orders consistent with this opinion.

So ordered.

FAHY, Senior Circuit Judge, concurring in Nos. 72–1629, 72–1630, and 72–1631, the Illinois cases, dissenting in No. 72–1628, the California case.

The decision of the Credentials Committee in the California case I think was within the competence of the Committee to make, subject to the will of the Convention. The contention to the contrary is that the action of the Committee deprived the plaintiffs-appellants of "life, liberty or property, without due process of law." The Committee action, however, would require the California delegation to the Convention to reflect the apparent choice in the primary of the several candidates for whom the people voted, in proportion to the votes the respective candidates received. Such a decision cannot in and of itself be described as a denial of due process of law. Moreover, it is quite consistent with the ongoing reform movement within the Party. It is said, however, that this otherwise quite acceptable result was a deprivation without due process of law, not because the California plan of "winner-take-all" must be accepted because the statute so provides,[1] but principally because (1) there was no objection made to the statute by any candidate prior to the primary, (2) there was also evidence

---

1. Our decision in No. 72–1629 supports the action of the Credentials Committee

though the Committee did not feel bound by the Illinois statute.

of its acceptance by Party officials, (3) the California legislature had recently reaffirmed the plan.[2] When the matter came before the Credentials Committee, however, that agency of the Party interpreted the reform resolution of the 1968 Convention, together with the guidelines thereafter adopted by the National Committee, to furnish a basis for the decision it rendered apportioning the delegates. Whether or not one agrees with this interpretation, I find in it and in its result no violation of the particular provision of the Constitution upon which appellants rely, or of any other provision of the Constitution. Whatever the political motivations of members of the Committee the action taken is not thereby rendered unconstitutional. I add that in my opinion the action of the Committee should not be overturned merely because it operated retroactively, as any decision of a court or agency usually does. *Cf.* SEC v. Chenery Corporation, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). *I accordingly would leave the matter for resolution by the Party*, soon to meet in Convention, without the court intervening by decree to set aside the action of the Committee.

It does not appear to me that the fairness of the process of electing the President of the United States is endangered either by the action of the Credentials Committee in apportioning the delegation according to the votes for each candidate in the primary, or by the Committee's interpretation of its authority, stemming primarily from the 1968 Convention, considered with the guide-lines subsequently promulgated by the Mc-Govern-Fraser Commission, and approved by the National Committee. These guide-lines, largely relied upon by the court, provide as follows with respect to their own status:

> Because the Commission was created by virtue of actions taken at the 1968 Convention, we believe our legal re-

sponsibility extends to that body and that body alone. We view ourselves as the agent of that Convention on all matters related to delegate selection. Unless the 1972 Convention chooses to review any steps the Commission has taken, we regard our Guidelines for delegate selection as binding on the states.

Thus, as it seems to me, the guidelines, in their reference to the 1972 Convention, afford greater latitude to the Credentials Committee in making its recommendations to the Convention than the court permits.

---

2. The extent of any detrimental reliance by the affected candidates upon the California plan seems to me wholly speculative. Moreover, no one acting in a non-partisan capacity on behalf of the voters in the California primary has sought participation in this litigation to contest the action of the Credentials Committee.