**Emily KORZENIK et al., Plaintiffs,**

**v.**

**Seymour A. MARROW, President, et al., Defendants.**

**No. 74 Civ. 516 (WCC).**

United States District Court, S. D. New York.

May 19, 1975.

---

Levy Gutman Goldberg & Kaplan, New York City, for plaintiffs; Abagail Pessen, New York City, of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendants; Douglas C. Fairhurst, New York City, of counsel.

## MEMORANDUM AND ORDER

CONNER, District Judge:

Plaintiffs, women who reside in the Village of Scarsdale,[1] commenced this action pursuant to 42 U.S.C. § 1983 for a declaratory judgment and injunction ordering The Town Club of Scarsdale to admit otherwise qualified women to membership. Plaintiffs contend that, in view of The Town Club's role in the Scarsdale electoral process, its exclusion of women is violative of the Nineteenth Amendment and the equal protection clause of the Fourteenth Amendment to the United States Constitution. Alternatively, they seek an order limiting the political role of the Club.

The action is before the Court on cross motions for summary judgment.

### I.

Defendant Town Club is a civic association which was organized to "promote concerted and intelligent action on all matters affecting the welfare of Scarsdale." Town Club Constitution, Art. II. Membership in The Town Club is open to all *men* who are interested in the stated aims of that organization and who have been residents of Scarsdale for at least six months.

The Town Club, which receives no public funding and finances its activities solely from the dues paid by its members, has established committees and procedures to influence decisions on such aspects of Scarsdale community life as: education; fiscal affairs; government services; land, buildings and highways; recreation facilities; library services; environmental problems; and, the non-

1. Plaintiff Thompson, apparently, no longer resides in the Village of Scarsdale.

partisan system for electing officials to village offices.

The Town Club was organized in 1904 by a group of men interested in the civic and political life of Scarsdale. H. Hansen, Scarsdale 108 (1954) [hereinafter cited as Hansen]. The non-partisan system for electing local officials originated in 1911 in an attempt to keep the Village government free from political strife. Hansen 126–29. In 1930, members of the Republican Town Committee and members of The Town Club decided that the non-partisan system should be given a wider base. On February 19, 1930, the Republican caucus passed a resolution declaring that the caucus should appoint a non-partisan committee to select candidates for office. This committee, composed of both Democrats and Republicans, was to make the nominations that were ordinarily made by the Democratic and Republican Town Committees. Hansen 130–31.

The civic leaders determined that The Town Club should draft a system which would formalize their goals, and in December 1930, the Non-Partisan Resolution (NPR) was passed by The Town Club. Hansen 131. The NPR embodies the written rules and procedures which govern the actual operation of the Scarsdale non-partisan system. This complex method for selecting the non-partisan candidate for Mayor, members of the Village and Town Boards, and Police Justice, has remained in effect, with minor changes, until the present. Plaintiffs allege, and defendants have not denied, that since 1955 non-partisan candidates have been opposed in only three elections and have never been defeated.

Moreover, The Town Club has remained the "custodian" of the NPR, and amendments to the NPR must be voted on and approved by The Town Club members.

## II.

### The Non-Partisan System—as provided for by the NPR

The NPR, as last amended in 1974, divides Scarsdale into six "Non-Partisan Units," each consisting of three contiguous election districts. Each unit sends six members, elected by the residents of the unit, to sit on the Citizens Nominating Committee. The Committee consists of the thirty-six voting members selected by the units, as well as five non-voting members. Two of the five non-voting members are the President and Vice-President of The Town Club; these two men serve, respectively, as Chairman and Vice-Chairman of the Citizens Nominating Committee. The Vice-President of The Town Club serves as Chairman in the President's absence. The other non-voting members are: 1) a representative of the Scarsdale Woman's Club; 2) a representative of the Village Club of Scarsdale (a women's club); and 3) a representative designated by the Conference of Scarsdale Neighborhood Association Presidents.

The non-voting members advise and consult with the voting members with respect to the nomination of candidates as well as all matters within the jurisdiction of the Citizens Nominating Committee. The Chairman of the Citizens Nominating Committee has various duties, including: 1) assuring that the Village Club of Scarsdale, the Scarsdale Woman's Club and the Conference of Scarsdale Neighborhood Association Presidents provide a non-voting member for the Citizens Nominating Committee; 2) assuring that the names of the members of the Citizens Nominating Committee are published in the local press; 3) sending out notices, instructions and background data to all members; 4) setting dates, times and places of the meetings; 5) soliciting names of possible candidates for Village offices; 6) distributing biographical data, which have been submitted with respect to possible candidates, to members; 7) chairing the meetings of the Citizens Nominating Committee; 8) inviting the Mayor and members of the Village Board to attend the first meeting of the year in order to discuss problems which may face the elected officials in the ensuing year and to suggest special qualifications of Board

members which would be desirable; 9) visiting persons selected as possible candidates in order to seek formal acceptance; and, 10) obtaining the formal nominating petitions required by the New York State Election Law.

Selection of the non-partisan candidate is finally determined by a majority vote of the thirty-six voting members of the Citizens Nominating Committee.

Recently, The Town Club amended the NPR [2] to establish the Village Government Non-Partisan Procedure Committee, in the place of The Town Club, as the body which has the obligation of "administering the procedure for election of the Citizens Committee" and "from time to time recommend[ing] amendments to the Non-Partisan Resolution." NPR Art. II.

The Village Government Non-Partisan Procedure Committee is a committee of thirteen persons. They are: the chairman and six other members who are appointed by The Town Club; two members of the Village Club of Scarsdale (a women's club); two members of the Scarsdale Woman's Club; and two members of the Scarsdale League of Women Voters (which is open to both men and women).

This Committee is charged with responsibility for preparing and distributing a detailed memorandum for use at the Unit meetings, and assuring that the unit nominating committee (the conduit for placing petitions bearing the names of possible candidates in nomination at the unit meeting) is complete. It also has the responsibility of keeping the system under continual review and making recommendations for changes in the NPR on the basis of this review.

By the date fixed for the holding of any party caucus for the purpose of making nominations for the village or town elections (or, if practicable, at least seven days prior to such date), the Citizens Nominating Committee is responsible for causing the independent nomination of the person selected through its deliberations to be filed.

### III.

Plaintiffs contend that The Town Club's involvement in Scarsdale's elective process deprives women of an equal voice in the electoral system. In this connection, they invoke the deep-south voting rights cases, although they do not assert that the system in Scarsdale parallels those cases. Indeed, they do not claim that they have been deprived of the right to vote for the non-partisan candidate in the non-partisan election. They contend, however, that since the NPR excludes women from participating in any vote to change the character of the non-partisan system, as well as providing that the Chairman and Vice Chairman of the Citizens Nominating Committee shall be the President and Vice-President of The Town Club and that seven of the thirteen members of the Village Government Non-Partisan Procedure Committee shall be appointed by the President of The Town Club, it is unconstitutionally restrictive of the Scarsdale women's right to participate in the procedure whereby officers of the Village are selected.

Defendants, on the other hand, contend that The Town Club is a wholly private, civic organization which is in no way subject to the constitutional strictures placed upon the State or any other organization which is performing a function traditionally performed by the State. Furthermore, defendants deny that the system is in any way restrictive of women's participation in Scarsdale elections, and assert that it was specifically devised to assure that all residents of Scarsdale more fully participate in the selection of candidates for Village offices. Defendants further assert that although The Town Club does retain the right to amend the NPR, it does so only after receiving the direct or tacit ap-

2. The Non-Partisan Resolution was amended February 7, 1974, one week after the filing of the complaint in this action.

proval of the other civic organizations, and that it functions as the "custodian" of the NPR only because no other organization has expressed the desire to do so. Finally, defendants claim that the membership policies of The Town Club are not subject to scrutiny by this Court since the Club does not itself sponsor any candidate or otherwise have any control over the selection of candidates for office.

## IV.

■ It is well settled that the Fourteenth Amendment does not extend to regulate private conduct, no matter how discriminatory, unless there is some governmental involvement. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Shelly v. Kraemer*, 334 U.S. 1, 12, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). In other words, it must be determined that there has been "state action."

In *Jackson v. Statler Foundation*, 496 F.2d 623, 629 (2d Cir. 1974), *appeal pending*, our Court of Appeals set forth five factors which must be considered in order to determine whether conduct amounts to state action:

"(1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes governmental approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms."

■ The Court, however, recognized that two standards have evolved: "a less onerous test for cases involving racial discrimination, and a more rigorous standard for other claims." 496 F.2d at 629. The rationale behind this double standard would similarly apply to sex discrimination, *Barrett v. United Hospital*, 376 F.Supp. 791, 797 n. 26 (S.D.N.Y. 1974), since classifications based upon sex, like classifications based upon race, are inherently suspect and must therefore be subjected to strict judicial scrutiny. *Frontiero v. Richardson*, 411 U.S. 677, 682, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (Justices Brennan, Douglas, White and Marshall); *White v. Flemming*, 374 F.Supp. 267, 270 n. 2 (E.D. Wis.1974); *Held v. Missouri Pacific Railroad Co.*, 373 F.Supp. 996, 998 (S. D.Tex.1974).

Thus, with this standard in mind, and in view of the fact that there is concededly no monetary aid or other assistance provided by the government to The Town Club, the question at bar is to what extent, if any, The Town Club exercises "powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co., supra*, 95 S.Ct. at 454.

It is clear that applicability of this "public function" doctrine is severely limited. *The New York City Jaycees, Inc. v. The United States Jaycees, Inc.*, 512 F.2d 856 (2d Cir. 1975). Indeed, in *Jackson, supra*, the Supreme Court indicated that, not only should the function in question be one traditionally reserved to the state, but one which the state is obligated to control. See *The New York City Jaycees, Inc. v. The United States Jaycees, Inc., supra; Powe v. Miles*, 407 F.2d 73, 80 (2d Cir. 1968). Furthermore, application of this theory has traditionally been limited to situations in which the constitutional violation occurred in the very activity in which the private organization performed its traditionally governmental function. *Barrett v. United Hospital, supra* at 799; *Howe v. United Parcel Service, Inc.*, 379 F. Supp. 667, 674 (S.D.Iowa 1974).

Although various cases have utilized this approach,[3] the cases most closely in point are those which involve some aspect of the right to vote. See, e. g., *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932).

## V.

A brief history of the voting rights cases, culminating in *Terry v. Adams, supra*, may be helpful in order to understand the underlying rationale.

In *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927), a black citizen of Texas brought an action under 42 U.S.C. § 1983 alleging that a Texas statute which prohibited blacks from participating in a Democratic primary held in Texas was violative of his Fourteenth and Fifteenth Amendment rights. The Court stated that the Texas statute effectively denied plaintiff the right to vote by "denying a vote at the primary election that may determine the final result." 273 U.S. at 540, 47 S.Ct. at 446. Thus, the Court ruled that Texas had denied blacks equal protection under the Fourteenth Amendment.

In response to the Court's decision in *Nixon v. Herndon*, Texas enacted a new statute which provided that

"every political party in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party * * *."

The purpose of this enactment was transparent—to take the State out of the picture and avoid the strictures of the Fourteenth Amendment. Accordingly, the State Executive Committee of the Democratic Party adopted a resolution limiting participation in the 1928 primaries to white persons.

In *Nixon v. Condon, supra*, the Court ruled that Texas' new policy was violative of the Fourteenth Amendment, and that *Nixon v. Herndon* was controlling. 286 U.S. at 89, 52 S.Ct. 484. The Court, however, specifically declined to reach the question whether a political party has inherent power to determine its own membership and concluded that it was sufficient that the State enacted legislation permitting invidious discrimination.

Following the decision in *Nixon v. Condon*, the Texas Democratic Party adopted a resolution barring blacks from membership. In *Grovey v. Townsend*, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292 (1935), the Court distinguished away the *Nixon* cases by stating that since party qualifications were set by representatives of the party in convention, there was no state action and petitioner was not denied any right under the Fourteenth or Fifteenth Amendment. The Court ruled that in spite of Texas's extensive regulation of primary elections, the party primaries were private affairs inasmuch as they were privately run and financed.

---

3. See *e. g., Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) (privately owned shopping center is the functional equivalent of a "business block" for purposes of the First Amendment, 391 U.S. at 325, 88 S.Ct. 1601); *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (where a tract of land was devised as a park for white people only, the mere substitution of private trustees for the land would not remove the restraints of the Fourteenth Amendment— where it was still "swept, manicured, watered, patrolled, and maintained by the city as a public facility for whites only." 382 U.S. at 301, 86 S.Ct. 489); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (whether a municipality or a corporation owns a town, the public is entitled to the free exercise of the liberties guaranteed by the First and Fourteenth Amendments); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) and *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), (elections) and see discussion *infra* pp. 82–84 of text.

Although *Grovey* represented an abrupt narrowing of the expansive view which the Court had been taking, only nine years later *Grovey* was overruled. *Smith v. Allwright,* 321 U.S. 649, 666, 64 S.Ct. 757, 88 L.Ed. 987 (1944).

In reversing *Grovey,* the Court considered the intervening case of *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), which held that the right to vote in a primary without discrimination by the State is a right secured by the Constitution, 313 U.S. at 314, 61 S.Ct. 1031, and ruled that Texas's comprehensive regulation of the system for selecting party nominees for inclusion on the general election ballot

> "makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election. * * * When primaries become a part of the machinery for choosing officials * * * the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election. 321 U.S. at 663–64, 64 S.Ct. at 765.

The Court concluded that by virtue of the State scheme for placing nominees on the general election ballot, the State adopted and enforced discrimination against black citizens. The basis of the decision was that under the statutory scheme, the party's actions constituted state action within the meaning of the Fifteenth Amendment.

The last and most far-reaching decision dealing with discrimination in the area of voting rights is *Terry v. Adams, supra.* In *Terry,* the Fifteenth Amendment was once again invoked to strike down a racially exclusive political party —the Jaybird Democratic Association or Jaybird Party (the Jaybirds), of Fort Bend County, Texas.

The Jaybirds had been the dominant political group in the County since its inception in 1899. In fact, although there was no legal compulsion on Jay-bird candidates to enter the Democratic primaries, they nearly always did so, and with few exceptions ran and won without opposition in the Democractic primaries following the Jaybirds' election as well as in the general election.

In three separate opinions, eight of the nine justices rejected the Jaybirds' contention that it was merely a private organization. In opinions in which seven of the justices joined, the crucial inquiry in determining whether an assertedly private group would be subject to the dictates of the Fifteenth Amendment was whether the functional equivalent of a prohibited election had taken place. 345 U.S. at 469, 481–82, 73 S.Ct. 809. Moreover, a plurality of the justices concluded, citing *Smith v. Allwright, supra* at 664, 64 S.Ct. 757, "any 'part of the machinery for choosing officials' becomes subject to the Constitution's restraints." 345 U.S. at 481, 73 S.Ct. at 819. See *Lucas v. Wisconsin Electric Power Co.,* 466 F.2d 638, 665 (7th Cir. 1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973); *Cf. Cason v. City of Jacksonville,* 497 F.2d 949, 951 n. 6 (5th Cir. 1974).

## VI.

Although the foregoing cases considered "state action" in the context of alleged violations of Fifteenth Amendment rights, the same analysis would apply to alleged violations of Nineteenth Amendment rights. See *Gray v. Sanders,* 372 U.S. 368, 379, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). Indeed, the language of the Nineteenth Amendment tracks that of the Fifteenth:

> "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

> "Congress shall have power to enforce this article by appropriate legislation." U.S.Const. amend. XIX.

> "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by

any State on account of race, color, or previous condition of servitude.

"The Congress shall have power to enforce this article by appropriate legislation." U.S.Const. amend. XV, §§ 1, 2.

Moreover, both Amendments were passed for the express purpose of bringing a particular segment of the population fully into the political process. See Kester, *Constitutional Restrictions on Political Parties*, 60 Va.L.Rev. 735, 759–60 (1974).

In determining whether the Scarsdale non-partisan system is constitutionally infirm, the decisive question is whether, in light of the foregoing theories of state action under the Fourteenth and Fifteenth Amendments, The Town Club improperly performs a function that is clearly governmental in nature (or has so far insinuated itself into a governmental function) and is therefore subject to constitutional strictures or whether The Town Club is merely a civic organization exercising its associational rights.

Recently our Court of Appeals considered the membership policies of a different organization claiming to be merely a private, civic organization. In *The New York City Jaycees, Inc. v. The United States Jaycees, Inc., supra*, the Court determined that the United States Jaycees' limitation of membership to males does not violate constitutional prohibitions of sex discrimination. The Court declined to find state action although the Jaycees, an organization primarily involved in community civic projects, receives thirty-one percent of its budget from federal funds, has the benefit of tax exemptions and is engaged in civic activities.

The Court ruled that the requisite connection between the government and the challenged activity did not exist inasmuch as discrimination could not be shown in the operation of federally funded programs. Indeed, the Court found it critical that women participated in the selection of local recipients for funding, implementation of the programs and in the benefits of all federally funded programs. Thus, the Court stated that the plaintiff had made no showing that the government was in any way involved in the Jaycees' membership policies.

The Court further ruled that the "public function" doctrine did not apply since the Jaycees were clearly not providing services patently governmental in nature.

### VII.

The instant case may be said to present a situation not entirely analogous to any of the aforementioned authorities. Although The Town Club does not deny anyone the right to participate in the elections to select non-partisan candidates (indeed, women apparently *do* substantially participate) The Town Club's position as "custodian" of the NPR (as well as its substantial involvement in the committees established thereunder) raises doubt about its character as a merely private civic organization. Additionally, plaintiffs allege a constitutional violation in the "very activity" in which they assert defendant is performing its traditionally governmental function.

The rights which the parties assert will be affected by the decision of this Court—the right of individuals to unfettered association for the advancement of their personal and political beliefs and the right of qualified voters, regardless of their sex, to participate in all stages of the electoral process—are assuredly among our most precious freedoms. See *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

The Supreme Court has consistently ruled that freedom to associate to further personal beliefs is implicitly protected under the First Amendment freedoms of speech, assembly and petition. *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); see *e. g., Baird v. State Bar of Arizona*, 401 U.S. 1, 6, 91 S.Ct. 702, 27 L.Ed.2d

639 (1971); *Williams v. Rhodes, supra; N.A.A.C.P. v. Button,* 371 U.S. 415, 430, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *N. A.A.C.P. v. Alabama,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

■ This right unquestionably includes the right of private clubs to form along chosen racial, religious or sexual lines without interference. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 179–80, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (Douglas, J., dissenting). Moreover, this right may not be abridged even if the association receives tax benefits and performs civic functions which are funded by the government. *The New York City Jaycees, Inc. v. The United States Jaycees, Inc., supra.* Furthermore, the Supreme Court has never ruled that a political party (much less a civic body) may never exclude or give a lesser role to whites or the elderly or women, for example. Once, however, any association performs a function which it is the duty of the State to perform, it is no longer entitled to conduct its affairs completely free from judicial interference. See e.g., *Jackson v. Metropolitan Edison Co., supra* 95 S.Ct. at 454; *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., supra; Evans v. Newton, supra; Terry v. Adams, supra; Marsh v. Alabama, supra.*

■ It is beyond peradventure that the structure and functioning of the process whereby state, county or local offices are filled is peculiarly state business. Indeed,

"[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution * * * the nature of their own machinery for filling local public offices." *Oregon v. Mitchell,* 400 U.S. 112, 125, 91 S.Ct. 260, 265, 27 L.Ed.2d 272 (1970) (Black, J.);[4] see 400 U.S., at 294, 91

S.Ct. 260 (Stewart, J., joined by Burger, C. J., and Blackmun, J.); *Pope v. Williams,* 193 U.S. 621, 632, 24 S.Ct. 573, 48 L.Ed. 817 (1903).

■ It is clear that the State may not be a participant either directly through legislation or indirectly through acquiescence, in a system which fails to afford women a vote in decisions affecting the electoral process or which relegates women to a minority position—to even the slightest degree—within that system. Thus, any organization which has the power to make decisions which ultimately affect the system for exercising the franchise would be subject to the same strictures. Indeed, it is clear that

"[t]he process by which candidates for an office are endorsed can be just as integral a part of the ultimate election as is the election itself." *Brown v. O'Brien,* 152 U.S.App.D.C. 157, 469 F.2d 563, 572, *judg. vacated on other grounds,* 409 U.S. 1, 93 S.Ct. 67, 34 L.Ed.2d 72 (1972).

■ Therefore, once it is shown that a private organization is, in effect, controlling a part of the electoral process, that organization becomes subject to the same constitutional restrictions which apply to the state. See *Terry v. Adams, supra; Cason v. City of Jacksonville, supra; National Socialist White People's Party v. Ringers,* 473 F.2d 1010, 1017–18 (4th Cir. 1973); *Lucas v. Wisconsin Electric Power Co., supra.*

### VIII.

On the basis of the record before the Court it appears that The Town Club is intimately involved with what is at least a very successful procedure for nominating candidates for Village office. Thus, The Town Club apparently totally finances that procedure, supplies the voting machines, as well as the staff which oversees the use of those machines, and has the ultimate say in any change in the system. Moreover, The Village Gov-

4. Although Justice Black announced the judgments of the Court, five separate opinions were filed.

ernment Non-Partisan Procedure Committee has a built-in majority of male participants appointed by The Town Club; and this committee, in addition to its ministerial tasks, is authorized to recommend changes in the system to The Town Club. Furthermore, the Citizens Nominating Committee must always be chaired by the President, or in his absence the Vice-President, of The Town Club.

Defendants assert that any apparent advantage which the men have is only in ministerial functions as to which sex discrimination would not amount to a constitutional deprivation. They state that it is significant that the Chairman and Vice-Chairman of the Citizens Nominating Committee (i.e., the President and Vice-President of The Town Club) are not eligible for Village office. As one example of their good faith efforts to avoid even the appearance of favoritism, defendants point out that the amendment to the NPR establishing the Village Government Non-Partisan Procedure Committee was first approved by the Directors and Board of Governors of the principal women's organizations in Scarsdale before it was submitted to The Town Club and, that, after adoption by The Town Club, it was ratified and approved by the members of those women's organizations.

The Town Club's assertions are not alone sufficient to remove their activities from the required judicial scrutiny. It seems apparent that if it can be proven that women are deprived of equal participation in determining the voting process or something tantamount to it, there may exist a constitutional violation as significant as a restriction on voting.

Moreover, it seems possible that the position of Chairman of the Citizens Nominating Committee, with its concomitant duties, can provide sufficient power and public exposure that it constitutes a proven springboard for candidacy in future elections. However, on the present record, such factors are too conjectural to serve as the basis for resolution of this complex question.

The Supreme Court has stated that:

"While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 723, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961); *Moose Lodge No. 107 v. Irvis, supra*, 407 U.S. at 172, 92 S.Ct. [1965] at 1971." *Jackson v. Metropolitan Edison Co., supra* 95 S.Ct. at 452.

A review of the numerous cases defining state action reaffirms the validity of this statement; it is apparent that each case turns on its own peculiar facts.

█ Thus, in view of the fact that any determination of the present motions may have a drastic and costly effect on an otherwise concededly "admirable" system, which apparently materially benefits the residents of Scarsdale, it is more prudent to attempt to make legal conclusions about these difficult problems on a full record.

The motions for summary judgment are therefore denied.

So ordered.